<table>
<tr><td>109</td><td>77</td></tr>
<tr><td>112</td><td>66</td></tr>
</table>

GRAFF *v.* DETROIT CITIZENS' STREET RAILWAY CO.

STREET RAILWAYS—CONTRIBUTORY NEGLIGENCE.

One who, without taking ordinary precautions, attempts to
drive across an electric-railway track in front of a rapidly
approaching car, and, on finding that he is unable to do so,
attempts to turn in the same direction the car is going, but,
because of the slipping of his horse, collides with a car com-
ing from the other direction, by which he is thrown from the
wagon under the first car, is guilty of such contributory
negligence as will prevent a recovery for the injury, where
the drivers of both cars did everything in their power to stop
after discovering his dangerous position.

Error to Wayne; Hosmer, J.    Submitted February 18,
1896.    Decided March 31, 1896.

Case by William J. Graff against the Detroit Citizens' Street Railway Company for personal injuries. From a judgment for defendant on verdict directed by the court, plaintiff brings error. Affirmed.

*Thomas Hislop* and *R. C. Barnes*, for appellant.

*A. C. Angell*, for appellee.

MOORE, J. The plaintiff sued defendant for injuries done to himself and his horse and other property in a collision with defendant's cars, which occurred September 30, 1893, at the intersection of Holden and Palmer avenues with Woodward avenue. After the plaintiff's testimony was all in, defendant's counsel moved to take the case from the jury. At the noon hour the trial judge visited the place of the accident. When the court convened in the afternoon, the judge directed a verdict in favor of the defendant. Plaintiff appealed the case to this court.

The record discloses that about 4 o'clock upon a rainy afternoon, September 30, 1893, the plaintiff drove east on Holden avenue, and attempted to cross Woodward avenue, which runs north and south, to Palmer avenue. He was driving a horse that would weigh about 1,200 pounds. This horse was hitched to a wagon which had a wagon box about 10 feet long and 32 inches deep. Miss Hall was in the rear of the box. Graff was standing up, and one Wick was on his right-hand side, carrying an umbrella. As Graff approached Woodward avenue, he heard a gong sounded from an electric car coming south at great speed. When he got to the asphalt pavement, he saw an electric car about a block away, coming north. When the plaintiff came into Woodward avenue, his horse was on a trot. The plaintiff testified:

"I tried to check the horse, pull off to the right, and avoid the car going south. As I got, it might be, as far as the curb, I saw I could not turn around, and I held back on the lines, and pulled the horse back, and

I could not stop sufficient to avoid colliding with the car. The horse collided with the car. He put his head alongside, and his breast struck on the car. The motorman coming north saw my condition. When he saw my condition,—that I could not stop my horse, and was trying to avoid him,—he stopped his car almost instantly. * * * I was attempting to avoid this car by turning south on Woodward avenue. I was partly turning that way,—going towards Palmer avenue,—but I was trying to avoid this car going south. As I got as far as the curb, or thereabouts, seeing I could not turn sharp enough, I pulled on my horse, but I could not stop my horse sufficiently to avoid colliding with the north-bound car. The horse ran against that car, and struck with his breast. * * * The motorman on the north-bound car, when he saw my condition,—when he saw I was trying to avoid his car,—took in the situation at a glance. He put on his brakes, and stopped his car almost instantly. And I pulled back after I had struck the side of the car. I might have pulled back two feet or so. Anyway, I pulled back. Then I heard the horse's feet striking on the asphalt pavement, and slipping somewhat, and that called my attention to it. I had the lines on the horse, and his front parts went down. I saw his hind parts going down, and the next moment I was tipping over. We all went off on the asphalt pavement. I could not jump out, my feet were so close to the end of the box. First I lay on the flat of my stomach, when I fell out. As I was getting up, I was just in about a position on my knees, and getting up again, when I got a crack on the back from the south-bound car that knocked me down again, and I saw the car was over me. I have a pain in my breast yet. Expected never to get out alive again. * * * When the horse's shoulders struck the north-bound car, I could not say what she was doing. She was going at an ordinary gait,—ordinary speed; not overgoing speed. The car stopped just about the time I reached it. The shafts went up,—the shafts raised up,—but I could not say whether a window was broken or not. They said there was. My horse slipped on his knees after he had struck the north-bound car. I was thrown clear from the wagon. I was lying on the asphalt pavement, sliding along.

"*Q.* After this had all happened, you say that the south-bound car came onto you?

"*A.* I did not see the south-bound car at all until I got

struck by it,—not after I took my eyes off the car; but I saw it up yonder. * * * The north-bound car stopped my progress. The north-bound car was on the east track. I was going at an ordinary trot, as I approached Woodward avenue, and the horse's head was from 80 to 100 feet from the westerly curb line, when I saw the south-bound car above. I had a good view from Woodward avenue to the north, but could not say how the view was to the south, and could not say how the building was situated at the south. There were some trees there. I saw the north-bound car coming up just as I got to the asphalt paving, or thereabout. I heard the gong on the south-bound car. * * * I saw nothing of the north-bound car until just as I got to the pavement; that is, about the turn-off. I was trying to turn south, and could not do it, as I explained before. I heard one gong, and that was all. She was over a block away. That called my attention to the south-bound car. At the time I was looking straight ahead, until I got to the crossing, and was about to turn, and I saw the other car, apparently going north; and I tried to turn south, and some way or other I could not govern the horse,—could not turn short enough, as I explained before,—and I tried to stop the horse, and could not stop him sufficiently to avoid his colliding with the north-bound car. The horse ran into it, anyhow. The gong was not ringing on the north-bound car. I first saw the car when I got to the asphalt pavement. * * * I was just about on the asphalt pavement when I saw the north-bound car coming up. I could not say if there was anything to prevent my seeing it before reaching the asphalt pavement, unless there were some trees. If I had turned south, as I tried to do, I would have been all right, but I could not do it, on account of my horse slipping. At the time that I was just coming to the asphalt pavement, I was looking straight ahead; and just as I took my eyes from that car, and got just about to the asphalt paving, I was about to turn, and I saw the other, the north-bound car. I tried to turn south by that car. The north-bound car was not straight ahead of me. It was from 40 to 60 feet from me, going up. * * * I was sitting in the front part of the wagon box, or rather standing against the side. * * * Fred Wick was on my right, sitting on a stove further back from the front. The hearth of the stove was at the front, and he was sitting about the mid-

dle, and I was up against the end of the box, facing south. It was an ordinary cook stove, and the legs were off. Miss Hall was sitting in the rear,—sitting on a box or something,—facing north, about 10 feet from me. The horse kept the same rate until I reached the asphalt, and, if any, it decreased somewhat as I was trying to stop it, but I could not do it. * * * It was raining a fine sort of rain,—not heavy."

On the cross-examination he testified:

"I had driven across Woodward avenue, on Holden, before, 400 or 500 different times. I certainly knew electric cars were running on that street very rapidly and frequently, in both directions. I was 100 feet, perhaps less, from the asphalt when I first noticed the south-bound car. That is my estimate of it. I did not measure it. I had a perfectly clear view of the south-bound car. The asphalt on Woodward avenue goes in on Holden about as far as the depth of the cross-walk,—about to the inside line of the sidewalk. I heard the gong first, then looked and saw the south-bound car beyond Hendrie avenue, the next street north of Palmer, east of Woodward. From Palmer to Hendrie is about 350 feet. Could not say how fast it was coming. I could hear it hum. I paid no attention to the car at all. She was a good distance off. Having seen where it was, I paid no attention, but drove along. I guess I did not hasten my speed.

"*Q.* You did not stop him, or try to stop him, until after he had got out on the asphalt pavement, and you saw the north-bound car. Is that right?

"*A.* Yes, sir; about got to the asphalt pavement, and saw the north-bound car. I seen I could not turn south. I tried to stop, and got about as far as the curb, or thereabouts, and I tried to hold back, when I saw I could not turn. I sawed on the horse's mouth with the lines, and tried very hard to stop him, and in spite of that I ran into the front part of the north-bound car. * * *

"*Q.* So this whole thing, after you passed the curb line until you were struck by the south-bound car, all took place very quickly; it was all done in a very short time?

"*A.* It was not very long, that is sure. I had no whip at all. Wick did not have a very big umbrella. He was not keeping the rain off me with it. Our feet were together. He had the umbrella over him, and not over

me. He sat right close to me, as I have described, on my right side. He was sitting on the stove. I seen that north-bound car as soon as I got to the asphalt paving. I was trying to turn off when I got to the curb line, and, when I saw I could not turn short enough, I tried to stop my horse and pull him back.

"*Q.* Before that you had not seen it, until you got that far?

"*A.* There [was no necessity for looking at it before that."

Mr. Wick and Miss Hall were also witnesses. Their testimony did not differ from Mr. Graff's.

Mr. Ostrich, a witness for plaintiff, testified:

"I had the second seat from the front, on the west side, in the car going north, at the time this collision occurred. I first saw Mr. Graff going east on Holden, trying to cross Woodward avenue, about 100 feet west of the track, going east on Holden, driving at an ordinary trot. When I saw him coming, and the speed we were going on the car, I thought to myself there might be a collision, and I had no more thought so than his horse got about on the west side of the track; and at the same time, before he struck the track, he hustled to turn his horse with the line, and some way the horse kind of slipped, and the car struck him. All in one moment it took place. He was just about the west curb of Woodward avenue when he began to pull his lines. He evidently saw the danger coming, and he pulled on the lines quick, and as he pulled the horse obeyed his line, and he slipped a little, and by slipping it did not gain headway fast as if it hadn't slipped, and by that time the car struck the horse's neck, and the horse went down. He tried to get up, but the force of the car kind of held him down again, and, before he could get up, the south-bound car, coming from the north, struck the whole rig, and ran over the horse and wagon. I guess the car struck square in the center of the whole rig. I don't remember whether the south-bound car was affected in its position on the track. It was not thrown off the track. I thought it was a very heavy collision, the way it jerked us around in the car, and the sudden stop. The north-bound car struck the horse's neck. The neck struck on the west side of the car,—the round iron,—the window in

front. When I first saw the rig on Holden, coming across, the car I was on was between 50 and 100 feet from Palmer or Holden. The conductor probably saw the rig, and began to slacken up. The north-bound car, to the best of my judgment, was going about 15 to 20 miles an hour, and it stopped within 50 feet after the brakes were applied. When I first saw the south-bound car, it was between Palmer and the next street, Hendrie. I should judge it was about 200 feet away. I kept my eyes on it. When the horse's shoulders came in contact with the north-bound car, I say the south-bound car was about 200 feet away. I saw Mr. Wick and Mr. Graff in their wagon. I can't say whether the north-bound car or the south-bound car threw them out of their wagon,—it took place so quickly. I think the south-bound car killed the horse and smashed their wagon. The horse was dead before the car was backed up. The front platform was on top of the horse."

Cross-examination:

" Mr. Graff was about 100 feet west of the track, on Holden, and was trotting along, when I first saw him. I could see him distinctly. The house on the south-west corner is back all of 40 or 60 feet from the street, and is known as the ' Mabley House.' I saw Mr. Graff as he reached the west curb, and before that. I guess it was his intention to go diagonally across Woodward towards Palmer. I saw him look up at that time and see the north-bound car. As he got to the curb line he saw the north-bound car. Then he attempted to swing his horse off to the right, down towards the south. He pulled on the right rein, and for some reason did not pull clear of the car. He came into the front of it. The front window was broken. I should judge the horse's head broke the front window. Some of the glass came inside the car. About that time the car stopped, and the horse slipped· and went down. Anyway, the wagon · tipped over. I don't remember which car did it, though. Then I looked around, and the south-bound car ran upon the body of the horse, and stopped with its platform over the horse. Whether that car went off the track or not, I don't remember. I don't think it. It was either the reversing of the brake, or the stopping of it suddenly, or probably both, that gave us a sudden jar on the north-bound car. The man put on his brakes and reversed his

current,—both I should judge, he stopped so quick. The north-bound car was stopped very quick. The north-bound car was between 50 and 100 feet south of Holden when Mr. Graff's horse first got on the pavement on Woodward. As soon as the motorman saw that Graff was going across the street, he began, I presume, to try to stop his car. I don't know what he thought, but that was done, anyway. I was sitting with my back to the west side of Woodward avenue. The sudden stopping of the car jerked me both forward and back. I don't think the car was going at more than the usual speed before the motorman checked his car."

Mrs. Russell testified on the part of the plaintiff:

"I was on the south-bound car at the time of the accident. I was alone in the car, and sat at the very upper corner, near the front-end door, on the west side. The first thing that called my attention to this difficulty was that I saw a wagon with two men and a woman turning into Woodward from Holden, and saw that it was an inevitable collision, and rose to prevent being hit by the débris, if they should strike the car, and moved towards the door. I really could not tell what the motorman did. I think he attempted to slacken, because I noticed the car. Of course, he saw them. The north-bound car was going very rapidly towards the north. Our car was going south. The man that was driving the horse was endeavoring to free himself from the south-bound car. I don't think he saw the north-bound car at all, because he certainly would not have gone across the track if he had. I could not tell how fast our car was going. It was coming rapidly towards Holden avenue. I think Graff was looking at the south-bound car, and had not spied the north-bound car until it came very rapidly upon him. He was trying to save himself from the other one. They came very near together there, and this car struck him. He pulled up as quickly as he could,—I saw that,—and the car struck the horse and killed it. As I rose quickly to go towards the end, the conductor went towards the front hurriedly, and I said, 'We are going to hit that man.' He passed towards the motorman, and by that time we had struck the man, and the horse was killed, and the things were tipped out, and the man was injured. * * *

"*Q.* You could not give us any idea of the rate of speed you were going?

"*A.* Yes; honestly, I thought we were going very fast.

"*Q.* And when did that very fast rate cease, or when did you feel that the brakes of the car were being applied? Whereabouts then were you from Holden avenue?

"*A.* They began at once to attempt to save themselves from this, if possible, but it was too late.

"*Q.* How far do you think the car ran, after you first saw Mr. Graff, before the car struck the horse?

"*A.* I should say it was what would be the length of three cars, perhaps; not more than that, I think."

Cross-examination:

"I don't think they had a raised umbrella. As soon as I saw that the horse was going to pass out into Woodward avenue, I realized that there was imminent danger of a collision, and was somewhat startled, and went towards the rear of the car. By the time I had gotten to the rear of the car the collision had taken place."

This was substantially all of the testimony offered by the plaintiff.

It is claimed on the part of the plaintiff that—

"Even if plaintiff was negligent in going upon defendant's track, and attempting to cross in front of the northbound car, yet, as defendant had time to stop its southbound car after plaintiff was seen to be in a place of danger, and did not stop its car in time to avoid the injury, plaintiff's negligence was not such as contributed to the accident, and defendant's negligence was the sole proximate cause of the injury."

It is urged that there was evidence tending to support this claim.

It is also urged on the part of the plaintiff that the whole case turns upon this fact, "Had the plaintiff not collided with the north-bound car, could he have crossed in safety in front of the south-bound car?" and the facts and circumstances show this could have been done, and he was entitled to have his case submitted to the jury upon that theory; citing Cooley, Torts, p. 674; *Mont-*

*gomery* v. *Railway Co.*, 103 Mich. 46; *Laethem* v. *Railway Co.*, 100 Mich. 297.

The difficulty with this theory is that the plaintiff did collide with the north-bound car, and the motorman of the south-bound car did all he could, when he discovered the dangerous position of the plaintiff, to avoid the injury. The testimony of the plaintiff's witness Mrs. Russell is that the motorman and the conductor began at once to save themselves, if possible, but it was too late. The car ran not more than the length of three cars after she first saw Mr. Graff.

This was an unfortunate affair, but Mr. Graff was alone to blame for the result. The asphalt pavement was wet and slippery. The plaintiff tried to cross in front of a rapidly approaching car. When he found he could not do that, he attempted to turn south, around the corner. His horse slipped upon the pavement, and he was unable to turn as quickly as it was hoped he would, and he collided with the north-bound car. Scarcely an appreciable period of time elapsed before he and his horse were struck by the south-bound car. Had Graff done as an ordinarily prudent man would have done, the injury would not have occurred. The case is clearly within the rule as stated in *Gardner* v. *Railroad Co.*, 97 Mich. 240; *McGee* v. *Railway Co.*, 102 Mich. 107; *Blakeslee* v. *Railway Co.*, 105 Mich. 462; *Fritz* v. *Railway Co.*, 105 Mich. 50.

The judgment of the court below is affirmed, with costs.

The other Justices concurred.