## TUNISON *v.* WEADOCK.

1. STREET RAILWAYS—CONTRIBUTORY NEGLIGENCE—QUESTION FOR JURY.

   Plaintiff was being driven along a street in the beaten track, which took her conveyance so near the track of a street railway as to render a collision reasonably certain. The driver thought he was far enough away to avoid accidents. The railway company claimed that plaintiff's driver turned suddenly upon its track without looking back. A car going in the same direction as plaintiff struck her carriage, and she was injured. *Held*, that the evidence did not conclusively show that plaintiff's driver turned suddenly towards or across the track, and the question of contributory negligence was for the jury. GRANT, J., dissenting.

2. SAME—RIGHTS OF TRAVELER ON STREET.

   A person driving along a street railway has a right to assume

| | |
|---|---|
| 130 | 141 |
| s89NW | 703 |
| 130 | ᴰ657 |
| 130 | 141 |
| s89NW | 703 |
| 131 | ²297 |
| j131 | ¹301 |
| 131 | ³622 |
| 131 | ᴮ670 |
| 130 | 141 |
| 135 | ²547 |
| 135 | ²548 |
| 130 | 141 |
| 139 | ¹255 |
| 130 | 141 |
| d142 | 27 |

that the motorman of a car following him will make some effort to prevent a collision, and is not bound to be constantly looking back.

3. SAME—DUTY OF MOTORMAN.

Where a person, for a considerable distance, is driving on a course so near a street-railway track as to make it reasonably certain that a collision will occur unless the car is brought under control, the motorman has no right to pursue his course and run the carriage down.

Error to Bay; Shepard, J. Submitted November 15, 1901. (Docket No. 127.) Decided March 26, 1902.

Case by Petronilla Tunison against John C. Weadock and Michael P. Heraty, receivers of the Bay Cities Consolidated Street-Railway Company, for personal injuries. From a judgment for plaintiff, defendants bring error. Affirmed.

Plaintiff and her husband, who was driving, were returning home from Bay City about half past 5 on the evening of December 15, 1899, along Center avenue. They were driving on the south side of defendants' track. Just behind them was another horse and wagon, with two occupants,—a man and his wife, named Robinson. A street car was coming from the rear. It passed Mr. Robinson's wagon, and some part of the car struck some part of the wagon in which plaintiff was riding, overturned it, and injured her. In some manner the wagon and its occupants were carried or thrown to the north side of the track, so that, when the car stopped, the horse stood facing in the opposite direction. The night was clear and cold. As the witnesses stated: "The cold made a squeaky noise. You could hear the wheels squeak." The road was level between the car tracks and the gutter, a width of 12 to 15 feet. Three grounds of negligence are alleged: (1) That the car was going at an unlawful rate of speed, viz., more than 12 miles an hour, the limit allowed by the ordinance; (2) that the motorman failed to give any signal or warning of the approaching car by ringing the bell or other-

wise; (3) that he neglected to see plaintiff, and take measures to prevent a collision with her buggy.

It seems essential to state somewhat fully the testimony upon which recovery is sought. Mrs. Robinson, who was riding in the wagon behind plaintiff, testified:

" We were going right along in the beaten track. We were close to plaintiff's carriage. We were more than a foot from the south rail of the street-car track,—about a foot; not more than that. We were coming right behind Tunison's rig, and the car passed us as quick as lightning, and it came onto this head rig. It must have been in a little farther than ours. It turned it bottom side up, and threw it farther onto the track like, and caught onto the car, and the car was dragging it along."

*Cross-examination:* " It was quite light, so you could see a car a great many blocks away, and a rig a great distance ahead of you. The road was free and clear. * * * I did not notice how close Tunison's rig was being driven to the track. I was not thinking anything about the car coming, it caught us so quick. I knew the cars came there regularly. I was sitting on the side next to the car, and thought I was entirely safe, and didn't pay any further attention to the car, nor how far from the track Tunison's rig was. In my judgment, they were almost, if not quite, as far from the track as our rig was. The car struck the side of the buggy,—the side that was to the car,—the whole side at once. It kind of struck it and threw it over in front of the car. It gave it a whirl around. * * * I did not know which part the car struck. I saw Mrs. Tunison on the south side of the track when the car catched her rig. It caught her rig, and kind of turned her around the opposite way, over onto the other side. The rig was not on the track. The car caught the side of the buggy. The horse got around in front of the car. It jumped over the track. The car must have shoved the buggy in front of it and along until it worked loose, and went over on the other side of the track. It kept going until it got loose from the car."

*Redirect Examination:* " It must have caught onto the side, and pulled the horse in front of the car. The horse kept on going after the buggy was struck."

*Recross-examination:* " Q. How did the buggy get around on the other side?

"*A.* The car struck it, and it was right in front of the car, and of course the car kept shoving it off.

"*Q.* Then the whole buggy was in front of the car?

"*A.* Yes, sir."

Mr. Robinson testified:

"We were going along the regular beaten road. In some places the road was beaten a little closer to the railroad, and in some places a little farther. The first thing I knew about it, the car struck the rig, and the rig came right around in front of the car. The car was running on at the rate of about 18 or 20 miles an hour. * * * The north side of Tunison's rig was about two feet and a half from the south rail of the track, as near as I could tell; at the time of the collision, in the regular beaten road. We were about two and a half feet in the regular beaten road. In some places it goes closer in than at others. No bell was rung until the buggy was struck. Tunison's rig was nearer the car track than mine at the time of the accident. I am positive he was in the beaten portion of the track. The side of the car must have scraped his buggy, and the horse got frightened and started. It threw the buggy over to the south a little. The horse made a kind of jump, and jumped over towards the car track. The buggy followed the horse. After the car ran ahead, the horse became separated from the buggy about 40 or 50 feet from the first collision. The buggy then left the track."

On cross-examination he testified:

"There is a broad, open roadway between the south rail of the track and the gutter line of the street where the accident took place. One portion may be a little better beaten than another portion, but it is all a broad, open, level roadway. You can drive on it all with convenience and safety. As near as I can tell, it is about 12 or 15 feet wide. * * * I thought I was far enough from the track to be entirely safe. I was right in the same beaten track he was. There was plenty of room to be six or eight feet away from the track, I suppose, if I had wanted to be; and Tunison was in the same beaten road. His rig was about a foot and a half from the track. I was observing at the time. I noticed because of the regular beaten track. There was nothing to hinder his driving along without reference to the regular beaten track. I thought he was safe. Just at the point where the accident hap-

pened, Mr. Tunison's rig came in too close to the track,— came in suddenly. As near as I can tell you, he must have turned in suddenly with the bend of the road, or otherwise. He must have pulled in onto the track suddenly, almost instantaneously; and, at the time he pulled in close to the track, the car was coming right behind and right alongside of me, and before he could get away the car struck him."

Adelbert Curry testified that he was upon the sidewalk about 60 feet from the place of the collision; saw the car coming for two blocks, and the rigs; that the car was running about 20 miles an hour.

"Tunison's rig looked to me as though he was three feet off the track. When the car struck the rig, the latter was, I thought, three or four feet away from the track. When the car got opposite the rear of Tunison's rig, the latter was still on the south side of the track, and had not started to cross the track. I don't know how it came to get on the track, unless the way the road was beat, and the horse happened to take the road and to turn in towards the track. * * * About the time the car struck the rig, the horse gave a jump and dragged the buggy over onto the track."

*Cross-examination:* "During the time I was attending to my own affairs, the car and the rig came together. As quick as I heard the noise, I turned around. * * * The horse must have turned in suddenly to get the wagon where it could be hit. It could not have been more than a second—a short bit—before the collision. At the time the horse turned in, the car was right behind him, I think, so there was not more than a second between his turning in on the track and the striking of the buggy by the car."

On redirect examination he testified:

" At the time the rig was first touched, it must have been on the track, of course, ahead. I couldn't tell positively whether the rig was right ahead of the car or at one side."

Mr. Tunison, plaintiff's husband, testified:

"I must have been pretty close to the track. If I had not been on the track, the car could not have struck me. I was driving in the beaten track, which is sometimes close to the rail and sometimes goes off two or three feet."

130 Mich.—10.

On cross-examination he testified:

" I don't know how the accident happened, but I thought I was far enough away from the tracks to be safe. I know I did not turn onto the track. I was on the side at the time the street car struck the buggy. I was not turning."

The witness admitted that he gave the following testimony upon the former trial:

"*Q.* Hadn't you started across the track?
"*A.* I didn't start to cross the track.
"*Q.* Hadn't you got your horse across the track, and your wagon right on the track, before the car struck you?
"*A.* I didn't calculate to go across the track. The horse shoved. That is more than I know yet.
"*Q.* Hadn't the horse got across the track? Wasn't the fore wheel of your wagon across the first rail and on the second rail before the car ever struck you at all?
"*A.* I don't know anything about it at all.
"*Q.* You don't know anything about it at all?
"*A.* No.
"*Q.* Why don't you?
"*A.* I don't know anything about it.
"*Q.* Will you say that you had not?
"*A.* Yes, I said I did.
"*Q.* You don't mean that, do you?
"*A.* I say I don't know that.
"*Q.* You don't know, then, whether you had turned your horse to go across the track, or whether you were crossing the track, at the time the car struck you?
"*A.* No, I don't know about that."

He further testified:

"I could not say how close to the track the buggy was; maybe a foot, maybe ten inches, maybe six inches. I can't tell how long the buggy had been so close to the track. I didn't pay any attention to it. There was plenty of room there to keep away from the track."

He also admitted having testified upon the former trial as follows:

" *Q.* You don't know where your buggy was at the time the car struck it,—whether it was in front of the car or beside it?
" *A.* No."

Plaintiff testified that she did not know where the buggy was when the car hit it. The above comprises all the testimony on the part of the plaintiff referring to the manner of the accident.

One Mrs. Butterfield, the sole occupant of the car at the time, was called as a witness for the defendants, and testified that there was a switch they had just passed, and that a car goes slower across a switch; that the car did not go fast by the switch on that occasion; that she heard the bell ring; that it started to ring near Green avenue, and kept ringing long enough for a half dozen teams to get out of the way.

"I was in the front end of the car on the south side. I thought I would look around, and see what the trouble was, and started to get up from my seat. Just then the horse's head struck the window on the north side of the car. I got out of the car, and noticed that the rig was on the north side of the car. The motorman was trying to stop the car."

One George L. Walt was returning from his work to his home from the east, and testified that he heard the bell just before he heard the crash of the collision; that he had gone about 30 feet, after hearing the bell, before the collision; and that he was on the track of the Michigan Central Railroad Company, east of the place of the accident, when the bell was rung.

The motorneer testified that he slacked down for the switch; that, when crossing Green avenue, he saw two rigs alongside the track, from two to three feet from it. As he got closer, he rang the gong, as he always did. That, when he got up to the rig behind,—

"This other rig pulled right across ahead of me. The car struck it in the side, and the old lady and gentleman were right in front of the window, sitting right there in front of the car. The rig slid around and tipped over. It lay right at the hind end of the car when I stopped. When I first saw the rig, I was going about six miles an hour, and when I caught up with the rig I was going between four and five miles an hour. I shut off the current

and put on the brakes.    When I saw they were going to cross, I reversed."

That he saw the rig as soon as it started to cross the track; that before that it had been a safe distance from the track.

"Just as soon as they started to cross, I commenced to take precautions, and undertook to stop.    It was not possible for me to avoid striking them.    After it was struck, no part of the rig was on the south side of the car.  *  *  * When I hit the buggy, the horse was on the north side of the track, headed towards the north,—had gotten across the track."

That a car running about six miles an hour could be brought to a stop in about 60 feet by using brakes and reversing.    There was no conductor on the car.

Plaintiff and her husband had often traveled over this street between the city and their home, were perfectly familiar with the situation of the tracks and the running of cars thereon, and knew that cars were passing every few minutes.    The accident occurred about 150 feet east of Green avenue.    The only testimony as to the distance the car went after striking the buggy was that of Mr. Robinson, who testified that, "after the car ran ahead, the horse became separated from the buggy about 40 or 50 feet from the first collision."    The court, in his instruction to the jury, said that the claim of the plaintiff was that the car struck the left forward wheel of the buggy, and that by some means the horse and buggy then got around in front of the car and on the north side of the car.    If the car struck the forward wheel first, it is evident that the horse and buggy were going towards the track. Plaintiff recovered verdict and judgment.

*T. A. E. & J. C. Weadock*, for appellants.

*Edward E. Anneke*, for appellee.

GRANT, J. (*after stating the facts*).    The following facts are established by the testimony:

1. Plaintiff and her husband were familiar with the manner and the usual speed of running cars in that part of the city.

2. A car passed every few minutes, and therefore they should have expected one.

3. Plaintiff and all her witnesses, including her husband, who was driving, supposed that they were far enough away from the track to permit a car to pass.

4. Plaintiff's husband turned suddenly towards or across the track just before the buggy was struck.

5. There was a good and safe roadway, 12 to 15 feet wide, between the track and the gutter.

6. Plaintiff and her husband took no steps to determine whether a car was coming. Either could have seen the car and its headlight in a second by turning his or her head. They do not testify that they took the precaution to listen for the ringing of the bell.

The disputed facts relate to the speed of the car, the ringing of the bell or gong, and the position of the horse and buggy at the time the car struck the buggy.

Two witnesses on the part of the plaintiff alone testified to the speed of the car,—Mr. Robinson, who did not see the car until just as it was passing his buggy; and Mr. Curry, who stood upon the sidewalk. Robinson testified to a speed of 18 to 20 miles an hour; Curry to a speed of 20 miles an hour. Mr. Curry testified that he did not know anything about the speed of cars running in the locality, but that they ran very swiftly, he should think. He did not see the car between Green avenue and the place of collision, a distance of 150 feet. His attention was directed to something else. He was then asked as to his competency to testify about the speed of the car that night, and was permitted to do so. Such testimony is of no value, and does not rise to the dignity of evidence, and should have been excluded. The horse was going at a "slow jog." If the car was going at a speed of 18 to 20 miles an hour, it would manifestly be impossible for the horse to jump in front of the car and to the other side of the track without being struck, and all agree that the horse was not struck. The opinion of Mr. Robinson as to

the speed is shown to be unreliable and incorrect by the undisputed facts and by his own testimony, for he says the car was stopped at 40 to 50 feet from the place of the collision. It would be impossible to stop a car in that distance going at the rate of six miles an hour, according to the uncontradicted testimony of the motorneer, who had been a motorneer on this road for six years. It is common knowledge that it could not be stopped in that distance if it was running at a speed of 18 to 20 miles an hour. The motorneer was the only witness on the part of the defendants who testified to the speed, and he fixed it at about six miles per hour. The sole passenger testified that the car did not go fast by the switch, which had just been passed, but gave no opinion as to the speed. The lawful rate of speed was 12 miles an hour. Whether this testimony was sufficient to justify the jury in finding that the car was running at an unlawful rate of speed I do not deem it necessary to determine, as I think the case must be disposed of upon another point.

The only disagreement among the witnesses in regard to the ringing of the bell is the distance of the car from the carriage when it was rung. Three of the witnesses for the plaintiff agree that the bell was rung at or before the collision. Mr. Robinson, on the part of the plaintiff, testified he was listening; that, "at the time he went by me, he struck the buggy, and the bell rang." Mrs. Robinson testified: "It did ring just as it struck the rig. It rang three or four times." Mr. Curry said, "There was no bell rung until about the time the car struck the rig." Plaintiff testified that "the bell did not ring before we were struck." Mr. Tunison testified, "I heard no bell rung before we were struck." In view of the noise made by the two horses and carriages over a hard and frosty road, it would not be surprising if these witnesses, only one of whom testified that he was listening, did not hear the bell, if it was rung. Three witnesses who were in position to know, and two of whom were entirely disinterested, swear positively that the bell was rung.

The important questions are, What duty did the defendants owe to the plaintiff, and what duty did she owe to herself and the defendants, while both were traveling upon the public highway, over which each had a right of passage? Courts have almost universally held that street railways have no exclusive right of way, and that motormen must be vigilant in keeping a watch for pedestrians and teams crossing their tracks or driving in front of the cars. Electric cars have become a necessity, and they are traversing not only cities and villages, but country towns. They must, and are permitted to, travel faster than ordinary vehicles drawn by horses; otherwise they would be of little use. At street crossings and other places, where the motorneers see people about to cross, or see them upon the track, or in a dangerous position, or partially on the track in front of them, they are bound to ring their bells or gongs as a warning; and, when they see any signs of danger, to keep their cars under control as much as possible. These cars cannot be stopped as speedily as carriages drawn by horses. Their speed is fixed by ordinance within cities and villages, and in this case the speed in the populous parts of the city is fixed at 8 miles per hour, and outside those limits 12 miles. The speed allowed where this accident occurred was 12 miles per hour.

This court, speaking through Chief Justice MORSE, in *Rascher* v. *Railway Co.*, 90 Mich. 413 (51 N. W. 463, 30 Am. St. Rep. 447), said:

"A street car can neither turn to the right nor left. It runs with greater rapidity and with greater momentum than a wagon or omnibus; therefore greater caution must be taken in its running to avoid collision. It ought to be lighted in the night-time, so that its approach can be seen by other travelers; and between twilight and dark, if not lighted, it ought to be run so slowly as to avoid collision, or else give by some signal warning of its approach. Street cars have precedence, necessarily, in the portion of the way designated for their use. This superior right must be exercised, however, with proper caution and due regard for the rights of others; and the fact that it has a

prescribed route does not alter the duty of the defendant to the public, who have a right to travel upon its track until met or overtaken by its cars."

'. A corresponding duty is also imposed upon the traveler by the fact of these heavy cars being run over the public highways for the convenience and carriage of the public. He is chargeable with notice that they travel faster than ordinary vehicles, that the momentum is greater, and that while running at a lawful rate of speed they cannot be instantaneously stopped. Therefore, when he turns his carriage to cross the street, it is his duty to look and see whether a car is approaching so near as to make it dangerous for him to make the attempt to cross. The same rule applies when one suddenly turns towards the track, and brings his carriage in line of an approaching car. Applying this principle, what was the duty imposed by the law upon the plaintiff and her husband? They believed that they were at a safe distance from the track. So did those who saw them, until a sudden turn was made towards the track, which brought the carriage within the danger line. They were in as good, and probably better, position to know they were at a safe distance from the track than was the motorneer. A man has not the right, knowing that the cars are apt to approach any moment, to put himself at what he believes to be a safe distance, and then hold the defendant company liable for damages because its motorman made a like error in judgment. If the plaintiff and her husband were riding upon the track, or were crossing it, or were in obvious danger while riding too close, it would have been the duty of the motorneer to not only ring his bell, but to apply his brake and reverse his motive power. The motorman is not called upon to act until he sees, or should see, that a person is in danger, or liable to run into danger. *Daly* v. *Railway Co.*, 105 Mich. 193 (63 N. W. 73); *Lyons* v. *Railway Co.*, 115 Mich. 114 (73 N. W. 139).

While the travelers by carriage have the right to use the entire highway from curb to curb, yet they have not

the right to turn quickly and blindly from a safe distance to a dangerous nearness to the track, or to attempt to cross without looking for an approaching car. Such negligence has been termed by this court gross negligence. *Wood* v. *Railway Co.*, 52 Mich. 402 (18 N. W. 124, 50 Am. Rep. 259); 2 Thomp. Neg. (2d Ed.) § 1389; *Graham* v. *Traction Co.*, 64 N. J. Law, 10 (44 Atl. 964); *Christensen* v. *Trunk Line*, 6 Wash. 75 (32 Pac. 1018); *Davidson* v. *Tramway Co.*, 4 Colo. App. 283 (35 Pac. 920); *Sonnenfeld Millinery Co.* v. *Railway Co.*, 59 Mo. App. 668.

In *Christensen* v. *Trunk Line* the car and the plaintiff were traveling in the same direction, and plaintiff suddenly turned to cross the track in front of the car. The court held that the motorman "had a right to presume that the respondent would remain off the track, and not knowingly place himself or his property in imminent danger; and he was not bound to regulate his speed at such a rate as would certainly avoid injury to any one who might attempt to cross the road in an unreasonable and improper manner."

In *Davidson* v. *Tramway Co.* it is said:

"It is very difficult to imagine circumstances which would excuse the injured party for his neglect to use his eyes as well as his ears to guard against an accident occurring while he is crossing the track."

In *Sonnenfeld Millinery Co.* v. *Railway Co.* it was held not to be the duty of a motorman to stop his car on seeing a person in the street, near the railway tracks, if such person when seen by him is not in a position of peril.

In *Fritz* v. *Railway Co.*, 105 Mich. 50 (62 N. W. 1007), plaintiff was driving a milk wagon in the same direction that the car was going,—the car coming from behind. He testified that he listened for the ringing of the bell, but could not hear anything. Without looking, he then turned diagonally across the track, and the rear wheel of his wagon was struck by the car. At page 53 my Brother MONTGOMERY, who wrote the majority opinion, discussed the general rules relating to travelers upon the highway and street cars, and said:

" Unless he had the right to assume that there was no car in the rear with which he was likely to come in contact, or unless he had the right to rely upon his failure to hear the sound of the gong, it was clearly negligent for him to turn across the track suddenly, and without assuring himself by proper investigation that no car was coming.   Booth, St. Ry. Law, § 315.   In fact, until the car approached the crossing, it is very doubtful whether it was the duty of the motorman to sound any gong.   So long as the plaintiff was traveling in the same direction, and at such a gait as would not result in collision, it cannot be said that the motorman had any occasion to sound the gong, as he would have no reason to apprehend that the plaintiff would come to a stop, or make a short turn across the track."

In *Blakeslee* v. *Railway Co.*, 105 Mich. 462 (63 N. W. 401), it was held to be negligence to go upon a street-car track without taking precautions to ascertain whether or not it is safe to do so, and that plaintiff could not avoid the legal effect of such negligence by placing himself in such position where he could not easily see an approaching car.   In that case my Brother Hooker cited with approval *Fritz* v. *Railway Co.*, and said :

"It was there held that one riding in a covered carriage, and thereby prevented from looking behind, could not recover against the street-car company when he turned suddenly upon the track in front of a car and was injured."

So, in this case, plaintiff and her husband were riding at a safe distance from the track, and suddenly turned towards it, and brought themselves within the danger line.

In *Wood* v. *Railway Co.*, *supra*, plaintiff was driving a one-horse vehicle along the street on one side of the tracks, when, encountering obstructions, he turned towards the tracks so that his right-hand wheels were over the rails.   He did not look behind him to see if a car was coming, until he felt something strike the rear wheel.   It was held, as a matter of law, that he was guilty of contributory negligence.

In *Lyons* v. *Railway Co.*, 115 Mich. 114 (73 N. W. 139), we held that a motorneer has the right to assume

that a person standing on the track will step out of the way, and that the motorneer is not bound to check the speed of the car until he has good reason to believe that such person is paying no heed to the customary signals. Why should the motorneer be required to assume that one traveling at a safe distance from the track will suddenly walk or drive upon it?

Counsel for plaintiff cites and relies upon two cases: *Manor* v. *Railway Co.*, 118 Mich. 1 (76 N. W. 139), and *Rouse* v. *Railway*, 128 Mich. 149 (87 N. W. 68). In the former case plaintiff had crossed the track from the south side to the north side, and before doing so looked both ways, and no car was visible. The roadway for about 9 feet from the track on the north side was macadamized with broken stone, worn smooth only in two parallel tracks where the wheels of vehicles ran. Plaintiff drove so that the wheels would follow in the beaten portions of the road. Cars passed at intervals of a half hour each. She had driven about 300 feet, when she heard a bell, and attempted to guide her horse away from the track, but was struck before she had time to do so. It was there contended that plaintiff had turned in towards the track. This, however, was a controverted question of fact, and, of course, properly submitted to the jury. The court plainly instructed the jury that, if this were so, she could not recover. That case would rule this if there were any dispute as to plaintiff's husband suddenly turning his horse towards or across the track, and if the roadbed in this case had been like the one in that. In the latter case there was a deep ditch upon the side of the highway, and the roadway at the side of the track was so narrow that teams in the daytime were driven into the ditch when cars were passing. The roadway was between 9 and 10 feet wide, and the footboard extended over the roadway outside the rail 2 feet. The deceased and his companion had never driven over the road before. It was in the night, and dark. We held, speaking through my Brother LONG, that the question of contributory negli-

gence was for the jury. Clearly, in my judgment, those cases do not control this one, where there was a roadway 12 to 15 feet wide, perfectly level, and the plaintiff and her husband knew that~cars were passing every few minutes, and that one was liable to overtake them at any moment, and yet took no steps whatever to protect themselves from injury, which they might have done without any inconvenience.

To sustain this verdict establishes the rule that jurors may find that travelers are free from negligence when they ride in a level street alongside street-car tracks at what they consider, and what in fact is, a safe distance therefrom, and suddenly turn towards the track and into the danger line, without taking any precaution whatever to determine whether a car is approaching, and in reliance upon their ability to hear the gong sounded or bell rung amid the noise made by two horses and two carriages, each with four wheels, riding over frozen ground. If such were the rule, it would be unsafe for street cars to run at the speed now allowed by law, and necessary for the convenience of the public. Such a rule is not, in my judgment, a just and reasonable one. A traveler has the right to drive upon the street-car tracks, and has an undoubted right to rely upon a warning from the approaching car for him to give it the right of way; in which case he is entitled to sufficient time to place himself outside harm's reach. But when, in his own judgment, as well as that of the motorneer, he is traveling outside harm's reach, I cannot recognize a rule which calls upon the motorneer to assume that he will suddenly turn within harm's reach. If it be granted that there was a conflict of evidence as to the speed and the ringing of the bell, and that the defendants were negligent in these respects, it is apparent to me that plaintiff was equally negligent.

The learned circuit judge very clearly defined the rights and duties of the parties in the following language:

" Now, the plaintiff's husband, in driving along there, knew that the street-car track was there, and that cars

were being operated upon it every few minutes, and he should use care in driving. He should be careful not to get on the track, or, if he did go on or near enough to the track to endanger them, before doing so it was his duty to look out; to look around to see that no car was approaching; to do what a reasonable and prudent person should to see that it was safe for them to go on the street-railway track, or to go at any time so near to it as to endanger their conveyance or themselves. And the street railway, or the car motorman in operating his car, was bound to keep a lookout for any obstructions that might exist upon the track, and to be careful and exercise due care lest he should run against or upon any obstructions there might be upon the car track, so as to avoid running against anybody in case they were upon the track. Any person driving along the highway has no right, as I have stated, to drive upon the track or to attempt to cross the track suddenly, without looking out to see whether or not the car was approaching. They have no right to attempt to cross a street-railway track, or put themselves in a place of danger, without looking or listening or taking some means to be certain that a car is not approaching. It is recognized nowadays that electric cars as well as steam cars are dangerous. They run with rapidity. They cannot be instantly controlled. They must be operated with care, and the people who use the streets and highways where they are in operation must equally understand that they must watch out and be careful, and not expose themselves to unnecessary danger.

"Now, the plaintiff in this case and her husband had a right to drive on the street-car track if they did it carefully. And, if it became necessary in any way for their purposes, they had a right to drive on the track; and if, while on the track, a car comes from behind, and the motorman sees them driving on the track or in close proximity to it, and he does not take care nor attempt to get his car under control so as to prevent hitting them, and he hits them, then he is guilty of negligence, and the company is liable, because they have rights on the track, and he must be careful. But that is a very different thing from what it is for a driver to suddenly turn on the street-car track when the motorman has reason to expect or anticipate no such thing, and, in fact, has a right to assume that the driver going along on the street with a clear road ahead will continue so to drive. The motorman has a right to fairly assume that they will do so."

The vice of the instruction lies in the fact that there was no conflict of testimony. Plaintiff and her husband did the very things that the judge told the jury constituted negligence on their part. They used no care. They did not look or listen, or take any means to be certain that a car was not approaching. Under the plaintiff's own theory, both she and her husband erred in judgment as to the distance they were from the track. If plaintiff and her husband had no reason to anticipate that they were in the danger line, why should they expect the motorman to have a judgment superior to theirs? Where a traveler is riding beside the track, and there is a good roadbed 12 to 15 feet wide, it is his duty to drive a sufficient distance from the track to avoid collision with a car. It is a reasonable rule that he do so, since the car cannot turn aside, and he can. By so doing he does not inconvenience himself, and avoids delays and dangers to other travelers upon the cars.

I think the judgment should be reversed, and new trial ordered.

MONTGOMERY, J. I cannot agree with the opinion of my Brother GRANT. The case is brought here to determine questions of law, and an examination of this record convinces me that there were distinct questions of fact as to the manner of this accident, which were submitted to the jury, and of which there was testimony, but which the opinion of Mr. Justice GRANT assumes not to exist. There was testimony tending to show that the plaintiff's husband was following the beaten track. That this beaten path took him and his conveyance very near to the car track is true, but the evidence by no means conclusively shows that he suddenly turned towards or across the track. Under these circumstances, I do not adopt the view of the law which my Brother GRANT takes. It is true that one traveling a public highway on which there is a street-car track is bound to use some caution. If he is turning to drive across the track, he is bound to look to see whether

a car is liable to come in collision with him. He is undoubtedly bound to look ahead for the same purpose. But I am not prepared to hold that he is, as a matter of law, bound to be constantly looking backward when driving upon or in proximity to the track. He has a right to assume that some effort will be made by the motorneer to prevent a collision; that he is in a position to see in advance, and to note whether a collision is likely if he continues in the course. See *Montgomery* v. *Railway Co.*, 103 Mich. 46 (61 N. W. 543, 29 L. R. A. 287); *La Pontney* v. *Cartage Co.*, 116 Mich. 514 (74 N. W. 712); *Goldrick* v. *Railroad Co.*, 20 R. I. 128 (37 Atl. 635); *Rouse* v. *Railway*, 128 Mich. 149 (87 N. W. 68).

In the present case there was evidence from which it might be found that for a considerable distance, at least, the vehicle in which the plaintiff was traveling was pursuing a course near the railway track,—so near as to make it reasonably certain that a collision would occur if the car was not brought under control. Under such circumstances it cannot be said that the motorneer had the right to pursue his course, and run this vehicle down. The case of *Fritz* v. *Railway Co.*, 105 Mich. 50 (62 N. W. 1007), presented a very different state of facts. In that case such a case as this was expressly saved. It was said in the opinion:

"It is not a case in which the plaintiff had been driving up the track, and was run down by the motorman, but an attempt to cross the track, unexpected and sudden."

This case and others cited by my Brother GRANT are distinguished by Mr. Justice LONG in *Rouse* v. *Railway*, *supra*. I think the case was a proper one for the jury.

The judgment is affirmed.

HOOKER, C. J., and MOORE, J., concurred with MONTGOMERY, J. LONG, J., did not sit.