CLARK v. JACKSON CONSOLIDATED TRACTION CO.

1. NEGLIGENCE—STREET RAILWAYS—HIGHWAYS AND STREETS.
    Upon testimony tending to prove, though contradicted, that plaintiff, after looking to ascertain if a car was coming, and seeing none, drove his wagon beside defendant's car track so near as to be in danger from approaching cars, a distance of over 700 feet, that while so proceeding he turned across the track without looking again, in front of a car that came up behind him, without any warning, and was struck by it, that the motorman made no effort to stop the car until nearly at the moment of the collision, the question of negligence was for the jury.

2. SAME.
    Plaintiff was not barred from recovering because he turned from a hazardous situation to one of greater peril.

3. SAME—CONTRIBUTORY NEGLIGENCE—LAST CLEAR CHANCE.
    And where plaintiff looked for a car when he first turned upon the street, and saw none for about three blocks, then traveled at about ten miles an hour to the point at which he turned, it was for the jury to say whether he was guilty of contributory negligence in relying on the fact that the car would have to travel at an unusual rate of speed to overtake him, and it was for the jury to determine whether plaintiff should have looked again. OSTRANDER, C. J., and MCALVAY and BROOKE, JJ., dissenting.

Error to Jackson; Parkinson, J. Submitted February 15, 1911. (Docket No. 190.) Decided December 29, 1911.

Case by Joshua D. Clark against the Jackson Consolidated Traction Company for personal injuries. Judgment for plaintiff. Defendant brings error. Affirmed.

*Thomas E. Barkworth*, for appellant.

*Forrest C. Badgley* and *Verne W. Badgley*, for appellee.

BLAIR, J.   I am of the opinion that the circuit judge did not err in submitting this case to the jury upon the facts disclosed by the record.

The testimony is in irreconcilable conflict upon the essential facts.  The testimony on behalf of the plaintiff tended to show that from the time he turned onto First street until his horses went diagonally across the track near Harwood street, his wagon was at all times so close to the track that the car could not have passed without colliding with it; that the gong was not sounded, nor other warning given, nor any attempt made to stop the car until almost the moment of collision; that the horses and wagon went onto the track, traveling slightly east of south, at a point 35 feet north of the north crosswalk on Harwood street, and the collision occurred 3 or 4 feet north thereof; that the usual rate of speed of the car was about 15 miles an hour, but the car was traveling faster than that at the time of the collision, and ran some 8 rods before stopping after the collision.

The motorman testified in part as follows:

"I first saw Mr. Clark and his wagon after I left Union street.  That would be about the first I would take any particular notice of him.  I might have seen from Morrell street, probably.  I don't remember seeing him on that day before the accident, particular, as I know of, until I got to McBride street.  I did see him at McBride street.  At that time he was on the west side of the track between McBride and Harwood.  He was three or four rods ahead of me—something of that kind; about halfway between Harwood and McBride. His horses were trotting.  At that time the ruts run in close to the track, so he would be so close you couldn't pass him.  I rung the gong, and shut the power off.  He turned out a little bit out of the road.  I saw he turned, or his horses went; anyway, he went, and I supposed he heard, and I throwed on the power again.  He was not in front of me; he was off to one side; generally, he went on his course.  He was two or three feet from the track. It was at a safe distance.  From the time I stopped—from the time he turned out, when I first rang the gong, as I have detailed, until he approached Harwood street, that

was the distance he was from the track. When I approached Harwood street, he acted as if he was going right straight on, and all at once turned right straight across the track. That was a little further beyond than I would have turned, if I was going to cross Harwood street. He turned squarer than I would have turned. When I saw he was evidently intending to cross Harwood street, I rang the gong and shut off the power and reversed. After I struck him, I didn't go more than a car and a half length. It would be about forty or fifty feet from the place where the car struck him. The car struck his wagon about in the center, a little back of the center, maybe. * * * He continued right along in the rut all the way until within about two or three rods of Harwood. It was two or three rods from Harwood street when he went out of the rut. That took him away from the track. Where he struck the track would have been a little bit south of the center of the road on Harwood. I think he was right in the middle of the intersection of the two streets before he turned to go to his home. * * * The car was then running at full speed. Cars run pretty rapidly down that grade. I don't believe I was running better than twelve miles an hour. * * * At the point where the rut left the track—left the rails—so as to bring a man driving in the usual traveled part of the way, it continued south most of the way, except two or three places through there. A man driving in the rut from that point four or five rods or better—five. No; I don't think he would be in a dangerous position within four or five rods of Harwood—this side of Harwood—north. Yes; I am pretty sure of it. Safe down through most of the distance; safe places like that. There was places, of course, where they couldn't pass on account of the mud holes, and the track was made in that way. The street was pretty rough outside of the beaten track. When I first gave warning, I shut off the power, and then shot it on again as quick, as I saw he was out of the way, and I could see a way to pass."

It is apparent from the motorman's testimony that he observed the plaintiff's position relative to the track throughout the block, and had full notice of such peril as that position indicated; and if his version of the facts is correct he was free from blame. On the other hand, if the jury accepted the plaintiff's version of the facts, they

would be warranted in finding that the motorman, recognizing the plaintiff's dangerous position, that, owing to the condition of the street, he would be likely to maintain it, that "he acted as if he was going right straight on," that he was likely to collide with him before he reached Harwood street (this being a just inference from his claim that he did stop the car for that reason), that a collision was inevitable, unless the plaintiff drove out of the traveled track, that the plaintiff was apparently not aware of the approach of the car, that his wagon was making considerable noise upon the frozen ground, recklessly ran his car at full speed, and without any warning of its approach, with actual notice that he would probably collide with some part of the wagon. If the collision had occurred while the horses were still proceeding along the wagon track, the case would have fallen clearly within the principle of *Montgomery* v. *Railway Co.*, 103 Mich. 46 (61 N. W. 543, 29 L. R. A. 287).

Does the principle of that case become inapplicable, because the plaintiff changed his dangerous position to one more dangerous? I think not. The motorman, having discovered the dangerous position which the plaintiff was in, was charged with the legal duty to so control his car as to prevent a collision, if reasonably practicable. The motorman owed this duty before the plaintiff changed his position; he did not cease to owe it because the plaintiff placed himself more in front of the car than he was before. This is not the case of one going suddenly from a place of safety, as apparent to the motorman, to a place of danger, but of one already in a perilous position, to the knowledge of the motorman, increasing his peril.

I am also of the opinion that the trial judge was justified in submitting to the jury the question of plaintiff's contributory negligence. Plaintiff testified that when he drove onto First street he looked to the north, and there was no car in sight, and he could see for three blocks; that he then drove rapidly to make his crossing at Harwood street, traveling, according to his estimate,

about 10 miles an hour. According to his testimony, a car would have to travel at a very unusual rate of speed to overtake him; and under such circumstances it would be for the jury to say whether he was justified in believing that he had plenty of time, or whether he should have looked again. *Ryan* v. *Railway Co.*, 123 Mich. 597 (82 N. W. 278); *Ablard* v. *Railway*, 139 Mich. 248 (102 N. W. 741).

I do not think the court erred in receiving the testimony of Dr. Myers upon the ground stated in defendant's brief.

The other points argued in the brief relevant to the charge of the court, so far as they have not been covered by what has been hereinbefore said, appear to me not to present prejudicial errors, but, on the contrary, the portions of the charge referred to were not unfavorable to the defendant.

The judgment is affirmed.

STEERE, MOORE, and STONE, JJ., concurred with BLAIR, J.

BROOKE, J. (*dissenting*). An action for damages, based on alleged negligence, resulted in a verdict and judgment in favor of the plaintiff. The defendant has appealed. The accident occurred on a street crossing, where the plaintiff sought to cross the defendant's track, and his wagon was immediately struck by defendant's car. That the plaintiff turned suddenly upon the track, without attempting to ascertain whether a car was near, is clearly proved. We have held that it is the duty of a driver, immediately before turning to cross a track, to look each way to ascertain whether it is safe to do so, and a failure to take such precaution is usually contributory negligence. See *Fritz* v. *Railway Co.*, 105 Mich. 50 (62 N. W. 1007). In that case it was made to appear that the plaintiff was driving north on a street, and turned abruptly upon the track, with the intention of crossing, and his wagon was struck by a car which he had not noticed, although it had followed him along the street.

Mr. Justice MONTGOMERY said, in *Fritz* v. *Railway Co.*, 105 Mich. 50 (62 N. W. 1007):

"The driver of a vehicle in a public street traversed by a street railway is bound to take notice of the conditions. He knows that the street cars run in grooved tracks, and that it is therefore impossible for the driver or motorman to turn out to avoid collision with an object on the track; that the only means of avoiding collision is by stopping the car; and that this cannot be done instantly. It is therefore negligence for the driver of a carriage to suddenly turn directly in front of an approaching car, whether the car be coming from the direction in which he is driving or from the rear. We think it is also true that, in the absence of something to excuse the performance of that duty, it is incumbent upon the driver of such a vehicle, before attempting to turn across the track, to take proper means of ascertaining whether the way is clear, and this is especially true of an attempt to turn across the track in the middle of a block, or at any place other than a regular crossing. See *Watson* v. *Railway Co.*, 53 Minn. 551 (55 N. W. 742). This the plaintiff failed to do in this case. Unless he had the right to assume that there was no car in the rear with which he was likely to come in contact, or unless he had the right to rely upon his failure to hear the sound of the gong, it was clearly negligent for him to turn across the track suddenly, and without assuring himself by proper investigation that no car was coming. Booth, St. Ry. § 315. In fact, until the car approached the crossing, it is very doubtful whether it was the duty of the motorman to sound any gong. So long as plaintiff was traveling in the same direction and at such a gait as would not result in collision, it cannot be said that the motorman had any occasion to sound the gong, as he would have no reason to apprehend that the plaintiff would come to a stop or make a short turn across the track."

This case has been frequently approved and followed. *Blakeslee* v. *Railway Co.*, 105 Mich. 462 (63 N. W. 401); *Graff* v. *Railway Co.*, 109 Mich. 77 (67 N. W. 815); *Borschall* v. *Railway*, 115 Mich. 473 (73 N. W. 551); *Ryan* v. *Railway Co.*, 123 Mich. 597 (82 N. W. 278); *Tunison* v. *Weadock*, 130 Mich. 141 (89 N. W. 703); *Bottje* v. *Railway Co.*, 157 Mich. 351 (122 N. W. 87).

The plaintiff's counsel seek to avoid the consequences of this rule in two ways. They contend that:

(1) The plaintiff had looked for the car a short time before, and that it was not necessarily negligent to cross without looking again.

(2) The motorman was chargeable with wilful and wanton misconduct.

The testimony shows that the plaintiff drove down First street to Union street, where he turned upon the latter. As he turned onto Union, he looked back, up First street, and concluded that no car was coming. He testified that he could see from $2\frac{1}{2}$ to 3 blocks, and satisfied himself that no car was coming, but that he must have been mistaken, as the sequel proved. It was 47 or 48 rods from the corner to Harwood avenue. When he reached that point, he brought his horses to a walk, and attempted to drive diagonally across the track, without looking for a car. We are constrained to hold that he was negligent in not looking back immediately before turning suddenly upon the track. See cases heretofore cited; also authorities cited in *Pilmer* v. *Traction Co.*, 15 L. R. A. (N. S.) note, pp. 256, 258, 259. We do not repeat the list; it is a long one, and includes many well-considered cases.

The basis of the charge of wantonness or failure to act upon discovery of plaintiff's danger is testimony tending to show that the condition of First street, though frozen, was rough and bad, and that the best portion of it was close to the car track, where the traveled wagon track was; that plaintiff's wagon and team proceeded along the car track in such close proximity as to preclude the possibility of a safe passing by the car, unless he should turn away from the track; and that this was obvious to the motorman. It is urged that it was apparent that he would be struck if he proceeded without turning out, and that, having discovered the danger, the motorman was guilty of wantonness, or, as is sometimes said, "gross negligence." The plaintiff testified that he did not hear the gong, or he would have turned out

and stopped his team, which it is apparent that he could easily and safely have done at any point, although the road was rough and bad. Had he even done so after he reached Harwood avenue, where there must have been room, he would have been safe. The motorman, if he rang his gong, had a right to expect this; and if he did not ring his gong until he saw plaintiff turning on the track there is nothing to indicate any wantonness, even if it was negligent, which we do not imply. It was then, for the first time, that plaintiff was in the danger of the collision, and the undisputed proof shows that then the motorman acted with promptness in an emergency which he had no occasion to anticipate. The alleged danger of driving near the track for 800 feet resulted in no injury, and had nothing to do with the accident, which was the immediate result of a failure to look for the car before turning on the track—a precaution that the law required, and that the motorman had a right to expect.

This subject is discussed in the case of *Blakeslee* v. *Railway Co.*, 105 Mich. 462 (63 N. W. 401). We said:

"It was contended that it was a case of recklessness upon the part of the motorman. If there was an intentional or wanton running into the load of barrels, by the motorman, after discovering plaintiff's perilous position, there would be room for the application of the doctrine that the negligence of the plaintiff was not contributory; but if that element was lacking, and the accident involved only a want of ordinary judgment, prudence, or care, there is no room for it. Doubtless the use of streets for cars is an inconvenience to other travelers. We should hardly recognize the common experiences of ordinary life, did we not understand that mutual annoyance and friction to and between those who operate cars and other vehicles is to be expected, and that wanton and intentional injuries are possible, as are unnecessary detentions of cars by wilful teamsters. But they are not to be presumed, and, unless there is some tangible evidence that a collision is intentional or wanton, a jury should not be permitted to so find."

See, also, *Allworth* v. *Lighting Co.*, 142 Mich. 25 (105

N. W. 75); *Merritt* v. *Foote*, 128 Mich. 367 (87 N. W. 262); *Borschall* v. *Railway*, 115 Mich. 473 (73 N. W. 551); *Daly* v. *Railway Co.*, 105 Mich. 193 (63 N. W. 73); *Lyons* v. *Railway Co.*, 115 Mich. 114 (73 N. W. 139); *Stenzhorn* v. *Railway Co.*, 159 Mich. 82 (123 N. W. 621); *Levy* v. *Railway Co.*, 164 Mich. 572 (129 N. W. 683).

We are of the opinion that, upon the theory that the case should have gone to the jury, there was error in the charge, as it indicated to the jury that proof of the failure to slow the car up and bring it under complete control, by reason of plaintiff's proximity to the track as he proceeded down Union street, was testimony tending to prove wantonness. Some of the cases cited support a contrary rule, as already appears.

The defendant was entitled to a directed verdict in its favor, and the judgment should be reversed and a new trial ordered.

OSTRANDER, C. J., and McALVAY, J., concurred with BROOKE, J.