ABLARD v. DETROIT UNITED RAILWAY.

1. STREET RAILWAYS—NEGLIGENCE—INJURY TO TRAVELERS.
   A motorman who runs his car on a dark, stormy night twice as fast as, under his own testimony, he should, to enable him to control it and prevent accidents, and depends on his gong to warn travelers, is negligent.

2. SAME—RIGHTS IN HIGHWAY.
   Street-railway companies do not possess an exclusive right to that portion of the highway covered by their tracks, but the ordinary traveler has a right to use every portion of the highway, including the space between the rails, until it becomes necessary for him to yield the track to the cars.

3. SAME—TRAVELERS—NEGLIGENCE.
   In using the track of a street railway, it is the duty of the traveler to maintain such a reasonable watchfulness for the approach of a car as, under the circumstances of the particular case, an ordinarily prudent man would. He is not required to be constantly looking back, but has a right to rely to some extent upon the exercise of proper caution on the part of the motorman in controlling his car in accordance with his legal duty and giving notice of its approach.

4. SAME.

It is not negligent per se for a traveler to drive his team along the track of a street railway in the night-time, though there is room in the street for him to drive off the track out of danger from cars.

5. SAME—INJURIES TO TRAVELER—CONTRIBUTORY NEGLIGENCE—QUESTION FOR JURY.

Whether plaintiff, injured by a street car approaching from the rear and colliding with his moving van while driving astride the track, was negligent, *held,* properly submitted to the jury.

Error to Wayne; Donovan, J. Submitted January 4, 1905. (Docket No. 6.)  Decided March 7, 1905.

Case by Thomas Ablard against the Detroit United Railway for personal injuries.  There was judgment for plaintiff, and defendant brings error.  Affirmed.

*Corliss, Andrus, Leete & Joslyn,* for appellant.

*Allan H. Frazer* and *William H. Turner,* for appellee.

BLAIR, J.  About half past 9 in the evening of June 20, 1902, Thomas Ablard, the plaintiff, was injured on Forest avenue, in the city of Detroit, by a collision between a street car and his moving van.  After loading his van with furniture from a house on Mt. Elliott avenue, about half a block north of Forest avenue, plaintiff drove south to Forest avenue, turned west on that street, and drove on west, with the wheels of his van "straddling," the north rail of the north track of defendant's street railway on Forest avenue.  When he had just passed Galster street, some 1,900 feet west of Mt. Elliott avenue, his van was struck by a street car approaching from behind on the same track over which he was driving.  The defendant maintained double tracks on Forest avenue.  On the south track its cars run in an easterly direction.  Westbound cars use the north track.  Plaintiff was familiar with this street, and with the operation of defendant's

cars thereon, and knew that they ran pretty frequently going both.ways. The street was well paved, and was 70 feet wide between the property lines. The space between the north curb and the north rail was 12 feet 8 inches wide. There was an electric tower light a block east of the place of the accident. The night was dark, and it was raining slightly, but where vision was unobscured the plaintiff's van could be seen, according to the estimates of different witnesses, from one to three blocks, or, according to the motorneer, one and one-half blocks away. The van was about 11 feet high, 16 feet 4 inches long, with a top 20 feet long, 6 feet 8 inches wide at the tires of the rear wheels, and 7 feet 8 inches from the outside of the rear hubs. The load of furniture weighed some 3,000 pounds, and prevented the driver from looking back through the van. Plaintiff sat in the middle of the seat when driving, and when he wished to look back had to move to one side.

The only point raised by defendant's counsel in his printed brief and on the oral argument in this court is that upon the record plaintiff was guilty of contributory negligence, and that the court should have directed a verdict for the defendant. We do not think that the court would have been warranted in directing a verdict for the defendant on the ground of plaintiff's contributory negligence under the circumstances of this case.

The plaintiff testified in his own behalf as follows:

" *Q.* Did you in going up Forest look back?
"*A.* We always look back.
" *Mr. Leete:* I move to strike that out.
" *The Court:* Strike it out.
" *A.* Well, I looked back.
" *Q.* Also ahead?
"*A.* Yes, sir.
" *Q.* What do you do also with reference to keeping track of any car coming behind you?
"*A.* We were always watching.
" *Mr. Leete:* I move to strike that out also.

" *The Court:* What you were always doing is not evidence of what you did on that night.

" Q. What did you do on this occasion ?

"A. I was watching for the car.

" Q. Did you see this car ?

" A. No, sir.

" Q. When you last looked, will you state whether any car had come around the turn ?

"A. There was none that I could see.

" Q. Did you see any ?

"A. No, sir, I did not.

" Q. Will you state whether you did anything with reference to listening for the bell?

"A. Yes, sir; I listened.

" Q. Did this motorman sound a bell ?

"A. I did not hear any.   *   *   *

(On cross-examination.)

" Q. Were you singing that night?

" A. Just a little bit of a hum that I have.

" Q. Singing so the people on the streets in the houses could hear you?

" A. No, sir; because I couldn't sing if I wanted to sing.   *   *   *

" Q. Now, were you not singing so that you could be heard in the houses near by?

" A. Not that I know of.   They might have heard me.

" Q. You were not thinking of listening for the gong of a car while singing that way?

"A. Yes, sir; we were always listening.   *   *   *

" Q. And not thinking of listening for any particular alarm that might be given?

" A. I was always watching.   That was an instinct that we had—that we were always watching.

" Q. Well, that singing would not help your hearing.

" A. And did not injure.   That humming that I was doing would not injure my hearing at all.   *   *   *

" Q. What was the reason you could not see it when it was a half block behind you?

" A. Because from the last time I looked it came upon me so quick."

Defendant's motorman, Fred Schultz, testified:

"The night I had the accident was a dark, rainy night. The rain came upon my vestibule from the west.   It beat

upon the front window. In operating the car before the accident I wiped the window about 10 minutes before on Kercheval avenue. After I had cleaned the window at that time I was running the car. I had no opportunity after that up to the time of the accident to clean the window. The effect of the rain coming on the window of the vestibule was to blur the glass. Going along Forest avenue I was on the north track. I came onto Forest avenue at Mt. Elliott, going towards the west. The night, aside from the rain, was dark. As I got along near Moran street coming towards Galster or Collins, I was operating my car the right way, occupying the vestibule and keeping a lookout. Between those streets I was sounding the gong. The gong is sounded with the foot. I could see, when operating the car going west, under the conditions I have described, ahead of me about 60 or 70 feet. When I first discovered that there was any obstruction on the track, I was about near Galster. Then I noticed a dark object up in front of me. I could not distinguish what it was. It appeared to be about 60 or 70 feet ahead."

Witness further testified that when he was off the car he could see about a block and a half down the street.

"That it took about a minute and a half to run from Mt. Elliott avenue to the place where I struck Mr. Ablard's van. I knew at the time and before that wagons, carriages, and people were liable to be ahead of me at any spot or place on the track. I looked out for them for myself. My life is in my hands. It was raining, and that obscured my vision looking through the glass to a certain extent. I could see about 60 or 70 feet ahead of me. That is all I could see, and after that dark. I could not distinguish whether there was any object on the track or not. The headlight gave a view 20 feet ahead."

Witness further testified that, taking in consideration the distance the car would slide, it required 125 feet in which to stop it.

"Q. Now, then, at what rate would you have to run in order to control your car so that you could stop after you saw an object and save it from damages?

"A. About seven or eight miles an hour.

"Q. So that on this night that you say was dark and"

rainy, and the rain on your glass, by running your car seven or eight miles an hour, you could have it under such control that, so far as you could see, you would be able to stop the car, and avoid the collision?

"*A.* Yes, sir.

"*Q.* Why didn't you do that?

"*Mr. Leete:* He has already told you he had a gong for a signal.

"*Q.* And then you preferred simply to rely on your gong?

"*A.* Yes, sir.   *   *   *   I was running about ten miles an hour on six points at the time of the collision. There are six points, and I had her up to the limit. That is, at the time I shut her off she was running on six points, and at full speed; the same speed that I would run on a sunshiny day up there."

The motorman testified that he rang the gong, but plaintiff gave evidence tending to show that no gong or bell was rung. If the testimony of the motorman that he ran from Mt. Elliott avenue to the place of the accident, some 1,900 feet, in about a minute and a half, is correct, then his car was moving at the rate of nearly 14½ miles an hour; and some of the witnesses on plaintiff's behalf put the speed at 15 miles or more. It is apparent that at this rate of speed he was running about twice as fast as he should have run, under his own testimony, to enable him to control his car so as to prevent an accident, with the limited vision afforded him. He also makes it clear that he expected to find people upon the track, but relied upon his gong to warn them off the track, knowing that, if they did not heed the warning, he must inevitably collide with them. If he traveled 1,900 feet in a minute and a half, he was traveling about 21 feet a second, and if, therefore, he could only see this large van some 60 or 70 feet ahead of him, the driver of the van would have less than four seconds in which to get off the track, provided the warning was given at the precise instant of discovery. The probability would be infinitely great of a collision under such circumstances, and it is apparent from the testimony

of the motorman himself that his conduct of the car was extremely negligent.

It has been repeatedly held by this court that street-railway companies do not possess an exclusive right to that portion of the highway covered by their tracks, but that the ordinary traveler upon the highway has a right to use every portion of the highway, including the space between the rails, until it becomes necessary for him to yield the track to the cars of the company. In using the track of the street-railway company, however, it is the duty of the traveler to keep in mind the fact that cars will be likely to follow and overtake him, and to maintain such a reasonable watchfulness for the approach of a car as, under the circumstances of the particular case, an ordinarily prudent man would. It was not negligence per se for the plaintiff to drive his team along the track of the street railway in the night-time, although there was room for him to have driven off the track, and where he could not have been struck by an approaching car. Whether the plaintiff looked back for the car as often as a reasonably prudent man should, we think was properly submitted to the jury under the circumstances of this case. We do not think he is required to be constantly looking back, or that he is necessarily negligent for not seeing the car. He has a right to rely to some extent upon the exercise of proper caution on the part of the motorman in controlling his car in accordance with his legal duty, and giving notice of its approach.

It was the duty of the motorneer to have the car under such control as to admit of its being stopped after he became able to discover objects on the track, and before a collision with such objects should occur, and it was his duty to give timely warning of his approach.

If the motorneer had performed his plain legal duty, under the decisions of this court, he would have been able, after discovering plaintiff's position, to have stopped his car and avoided a collision. He chose, however, to run at such a rate of speed, when his vision was limited by

the darkness and the rain, that, as testified by himself and uncontestably shown by the result, he could not stop his car in time to avoid the collision.

We do not think it can be said, under such circumstances, that plaintiff was bound to take into consideration that the car which struck him might be run at such a reckless rate of speed; and the jury might well have found that, if the car had been run at the rate of speed at which the motorman said he could control it in time to prevent an accident, its approach would have been observed by plaintiff. Plaintiff testified that he looked for the car, and that the last time he looked, no car was in sight, and that he was constantly watching and listening for its approach, and that the only reason he did not see it in time was because it came so quick after he looked the last time. We think that the question of contributory negligence was properly submitted to the jury. *Rouse* v. *Railway Co.*, 128 Mich. 149, 135 Mich. 545, 547; *La Pontney* v. *Cartage Co.*, 116 Mich. 514; *Manor* v. *Railway Co.*, 118 Mich. 1; *Mertz* v. *Railway*, 125 Mich. 11; *Tunison* v. *Weadock*, 130 Mich. 141; *Bedell* v. *Railway*, 131 Mich. 668; *Mahoney* v. *Railway Co.*, 110 Cal. 471; *Chauvin* v. *Railway*, 135 Mich. 85 (97 N. W. 160).

The judgment is affirmed, with costs.

MOORE, C. J., and MCALVAY, GRANT, and HOOKER, JJ., concurred.