HARNAU v. HAIGHT.

1. EVIDENCE—AUTOMOBILES—SPEED—SUFFICIENCY — INCOMPETENCY.
   In a personal injury case, for being run down by defend-
   ant's automobile, in the dark, testimony of an eyewitness,
   that from the exhaust of the car it appeared to be going
   30 miles an hour, was immaterial and should have been
   struck out, since the speed of a car has no necessary rela-
   tion to the rapidity of the exhaust if the clutch is out;
   but the witness having expressed his opinion that the
   rate of speed, independently of the exhaust, was about 20
   miles an hour, the error in admitting the testimony was
   harmless.

2. SAME—OPINION EVIDENCE—SPEED.
   The opinion of a witness who had been an engineer, and
   whose qualifications were established to form such judg-
   ment, that an automobile which he only saw move over
   a space of 20 feet before it struck plaintiff was moving
   at the rate of 20 miles an hour, was properly admitted,
   and its weight was for the jury.

3. SAME—REBUTTAL—AFFIRMATIVE PROOF.
   While testimony that there were no lights on defend-
   ant's automobile was not properly rebuttal, the court did
   not err in the exercise of its discretion by receiving the
   evidence.

4. SAME—ORDINANCE.
   Where the plaintiff's contention was that he was riding
   along the street on a bicycle when defendant approached
   from the rear without lights and ran him down, and the
   contention of the defense was that plaintiff turned from
   the side and ran into the car, it was not error to exclude
   from the evidence an ordinance of the city wherein the
   accident occurred requiring vehicles that move slowly to
   keep as close as possible to the curb, on the right, allow-
   ing more swiftly moving vehicles free passage to their left;
   as the issues were such as to render the ordinance imma-
   terial, the contributory negligence of plaintiff not being
   in issue if plaintiff's evidence was believed, and the fact

of being on the wrong portion of the road not affecting the claim of the defense that plaintiff without excuse turned into the moving automobile.[1]

5. TRIAL—CHARGE—REQUESTS.

Where counsel for defendant, in response to an inquiry of the court at the close of the charge, orally asked the court to instruct the jury in relation to defendant's contention and claim that plaintiff turned out of his course and ran into the side of defendant's automobile, and the court declined to instruct further, but the charge failed to cover the point referred to by defendant's attorney, the error was reversible and prejudicial although no request in writing was preferred; if such request was desired, counsel should have been given time in which to prepare it.

Error to Muskegon; Sullivan, J. Submitted October 13, 1915. (Docket No. 81.) Decided December 22, 1915.

Case by Peter Harnau against Louis P. Haight for personal injuries. Judgment for plaintiff. Defendant brings error. Reversed.

*Cross, Vanderwerp, Foote & Ross,* for appellant.

*Turner & Turner,* for appellee.

PERSON, J. This is an action to recover damages for personal injuries received by plaintiff on the evening of October 27, 1913. At the time of the accident he was riding a bicycle and going east on the south side of Western avenue, in the city of Muskegon. The defendant was also going east on the same side of the street with his automobile, and following the plaintiff. It was about 6 o'clock in the evening, and so dark that the street lamps had been lighted. The day had been cloudy, and some rain had fallen. The plaintiff claims

[1]On liability of automobile owner for collision with bicyclist, see note in 28 L. R. A. (N. S.) 557.

that the defendant was driving very rapidly, without any lights on his car, and that he overtook and ran over plaintiff before the latter could get out of the way. The defendant insists that the pilot lights or small lights on either side of the dashboard of his car were lighted, and that he was driving at a moderate or slow pace. It is his theory that as his car came alongside of plaintiff the latter turned his bicycle so as to avoid the street car tracks, thus colliding with the automobile and being caught under its left fender. The claims of the parties can be best stated in their own words. The plaintiff testified as follows:

"I live at 56 East Walton street, and am now 45 years old. My occupation is driving a team for the Muskegon Brewing Company bottling works. I was driving a team the day I was hurt. I was returning home on a bicycle at the time. I came straight up Western avenue, going east on the right-hand side. I had a light on the front end of my bicycle. It was shortly after 6 o'clock when I came along there by the Toledo, Saginaw & Muskegon depot. It had been an awful dark, dismal day that day. It had been raining in the afternoon and was cloudy. It was dark that night. It had been raining just a few drops that night, but it wasn't raining when the accident happened. I should judge it had been dark about half an hour— dark enough so street lamps had to be lit. I was coming along, and just as I got pretty near to the depot of the Toledo, Saginaw & Muskegon, I heard the whir of an engine of an automobile back of me. I turned around and saw a dark shape coming, and I yelled and tried to get out of the way, but it struck me before I could get away from it. I heard no warning or sound of a gong, or anything like that, except the whir of the engine just before it struck. I tried to get out of the way, and I couldn't. He was on to me too quick. He struck me from behind and turned me over.   *   * * When I turned around and saw that automobile coming there was no lights there. If there had been a light on that automobile, I would have seen it. There wasn't a particle of light on it.   *   *   * When we

were going out to the hospital Mr. Haight made the remark a couple of times that he had his rain shield up and couldn't see a thing. He said he didn't see me until he struck me. I told him if he had his lights lit he couldn't help but see me, and he didn't make any reply to that. I think the automobile ran over me."

On cross-examination he further said:

"As I came down Western avenue from my work I kept close to the street car track. I should judge that the street car track was about 20 feet from the curb. After I passed the Pere Marquette track I didn't change my course any to speak of; I couldn't very well. It is pretty rough there where the street car track crosses the railroad track. At that time I was just going along at an easy gait on a bicycle. The pavement along there is pretty rough in places. You couldn't very well see the bumps only as you come to them. I kept on that side of the street car track. I might have varied a few feet either way in trying to escape bumps. It had been raining, and there were puddles all over the street. I might have turned a couple of feet either way to get out of the puddles, but I was on the right-hand side of the street car track all the way up. When the accident happened I had crossed the Pere Marquette tracks and had gone on towards the east from that track. The street car track on the east of the Pere Marquette track changes its course a little bit. There is a switch there that commences several feet from the Pere Marquette tracks, and as I was traveling along there I would come in towards the south a little on account of the switch. I don't think there was any time when I traveled between the rails of the street car track that night. When this accident happened, I was 3 or 4 feet from the rail of the street car track. It was quite dark. I couldn't see very far. There were street lights all the way up the avenue. There was a street light on the corner by the depot; that would be possibly a third of a block from where I was when the accident happened. The lights were only on the corners."

It was shown by the assistant city engineer that the

westerly end of the switch of the street railway track
was about 12 feet east of the Pere Marquette crossing,
and that it was 17 feet and 2 inches from the curb on
the southerly side of west Western avenue to the first
rail of the street railway track.

The defendant's testimony as to the accident was as
follows:

"My place of business is situated about a quarter of
a mile from the place of the accident. That evening
as soon as the whistle blew at the mill I put on my
things and went out to my machine. I pressed on the
button which threw on the lights so that I could see
how to put in my plug in order to start the machine.
That switch lighted my pilots and tail light and the
lights over my speedometer and clock. I backed out
of the shed and came up past Ninth street. There I
saw ahead of me on the left a light, and was looking
for railroad trains, supposing that light to be the rail-
road guard there signaling for a train. There was a
train due from Chicago that got in about 6 o'clock,
and I thought probably that train was coming, so I
threw out my clutch, and at the same time I noticed
my speedometer, which was in plain sight. I was run-
ning at eight miles an hour. My brakes were not
brand-new, and so I cut down my power on my throt-
tle and coasted from just the other side of Ninth
street up to the Pere Marquette crossing. Just before
I reached that crossing I saw a green light almost
ahead, but a little to the left of my right of way. It
then disappeared and only the one light remained on
the left-hand side of the road. Just about as I was
crossing the Pere Marquette track I saw a red light.
It seemed to be a little bit to the left of where the
green light had been, then that disappeared, and the
raindrops on my wind shield made the light from
Eighth street appear as though there were many
white lights there, but as I crossed I saw this light,
and I heard the noise of the engine which was blowing
off steam or pumping water. I started to put in my
clutch, at which time I must have been running slower
than when I threw out my clutch and started on up the
street. Just at my left fender, back of it, appeared

suddenly a green light, and I saw a man go down under my fender. I didn't know what had happened, but I knew something had happened, so I turned my car and drew up to the curbing, threw out my clutch, and went back to see what was the matter. * * * The automobile is a Henry 40. I think it weighs 3,000 pounds. * * * The lights on my car were not out at any time that night. These pilot lights or small lights usually on the dashboard are on either side. * * * I can see half a block ahead with those lights for anything that is in the way of the line of vision. You can't see the sides. They are not intended to see on the outside. You cannot see on the side with the strong headlights. So far as operating the car is concerned, you can see as well with one as with the other. If Mr. Harnau had been directly in front of my car, I could have seen him. Just before the collision I heard Mr. Harnau call out something, but it was nothing that I could understand any more than, 'Look out there!' and was simply as he went down. I knew it was a man and a bicycle. The injury broke my left fender. * * * The front end of my fender was not touched a particle. If I had struck him, it would have struck the front end there, and broken that, instead of breaking it down here. * * * When I saw this man go down under the fender and I ran up to the curb and stopped, I did not apply my brakes. I simply turned my wheel to the right as far as it would go and then brought it up to the curb. I didn't use my emergency at all; just used my foot brake when I got up there."

On cross-examination he said:

"I had headlights on the car. Those lights are much brighter than the side lights and they throw a light far ahead of the car in the highway, much farther than the side lights do. I didn't have those headlights lit that night. The side lights are just ahead of the dashboard. It was a dark night. I had my wind shield up. I had to look through that wind shield. That was the only way that I could look ahead. I was seated on the right side of the car. When I started out from the factory it was raining. The top was up. All the side curtains on the machine were on. The rain

and the mist that had accumulated there on the wind shield did not perceptibly obstruct my view.  *  *  * These side lights were electric lights.  *  *  * I saw the tender of the locomotive after I got up there. The tender was towards me. It had no light on it, and I couldn't see the tender until I crossed the railroad. I was from 20 to 25 feet from the tender before I could see it.  *  *  * I saw a green and a red light. I knew at that time the kind of light they carry on a bicycle. I knew they carried a green and red light. There was no tail light. I couldn't see anything except the side lights. As the green light came in range of my left pilot light I saw the man and the bicycle and the light all about the same instant, and saw him go down under my fender. My machine was past him before I saw him. I was going straight, right straight up; never changed my wheel at all to speak of. I could see him come into the fender.  *  *  * I claim this man ran into me; that he was headed obliquely towards me and ran into me.

"*Q.* The back part of that bicycle then, the back wheel, appears to be crushed down, don't it?

"*A.* Yes."

It was charged in plaintiff's declaration that the defendant drove his automobile at a high, dangerous, and unlawful rate of speed, with a reckless disregard for the safety of others; that he did not keep a proper lookout for persons on the street, nor have his headlights lit, but recklessly disregarded his duty in these respects, and that he "approached this plaintiff from behind," and "did carelessly and negligently operate and drive said automobile directly upon this plaintiff."

The injury to plaintiff was severe and painful. There was a compound fracture of both bones of the right leg about halfway between the knee and ankle. The jury awarded him a verdict of $3,000, and the defendant brings the case to this court by writ of error.

1. The first six assignments of error relate to the admission of testimony. One Robert Pearson, a witness produced by the plaintiff, testified as follows:

"I have been an engineer since 1891 on the Pere Marquette road, and am still employed in that capacity. I know Mr. Harnau. On the evening of October 27th I saw him after the accident occurred lying mixed up with his bicycle on the pavement on Western avenue near the Pere Marquette tracks, about 20 or 30 feet east of it; that is, near the Toledo, Saginaw & Muskegon depot. It was on the south side of the street car track. I got a glimpse of the automobile that evening before he was struck by it. I noticed the speed at which the automobile was going. I am accustomed to taking speed of trains and other moving objects. I have some knowledge of those things. I have got to have.

"*Q.* Now, tell us, in your opinion, at what speed that automobile was going?

"*Mr. Foote:* Just a minute. I object to that. The witness hasn't shown himself competent to answer it.

"*The Court:* I will take his opinion anyway.

"*Mr. Foote:* Exception.

"*A.* Well, sir, the speed when he shot by the tank the way the machine was, his engine was running, it appeared to me that it was going about 30 miles an hour, but the automobile was going about 20. When I noticed this speed we were standing just north of the street car crossing, just to clear, so that a car could pass us. We were standing on the north side of the street. We were about 20 feet from the automobile and about 25 feet from where Mr. Harnau lay. I couldn't see him when he was struck. It was dark. * * * I couldn't see any lights on the automobile. There was nothing to obstruct my view from where I was."

On cross-examination he said:

"I was on the engine the night when this accident happened. * * * The first time I saw the automobile was when it shot from behind the tank. I did not see it as it approached the tank at all. But just as it shot by from behind the tank—right when it was directly opposite the tank on the engine—I saw it.

"*Q.* And it didn't go over 10 feet before Mr. Harnau came in contact with it—10 or 15 feet?

"*A.* Well, it was about 20.

"*Q.* Then, your estimate of the rate of speed that car was going was based upon what you saw it doing there at 20 feet; is that right?

"*A.* I based my theory on the rate of speed that automobile was going when it shot from behind the tank until I heard the explosion of the tire.

"*Q.* You didn't see any lights on this automobile?

"*A.* No, sir.

"*Q.* How far could you see from the cab that night?

"*A.* Well, I should judge that I could see about 30 feet."

On redirect examination:

"*Q.* You said something about determining something by the noise of the engine. What did you mean by that? What did you say about this engine.

"*A.* Why, from the exhaust of the engine I thought he was going about 30 miles an hour.

"*Mr. Cross:* I move to strike out what the witness thought, on the ground that he hasn't shown any competency to judge the rate of speed from the throb of a gasoline engine.   *   *   *

"*The Court:* I am going to let it stand.

"*Mr. Cross:* Exception."

The testimony of Mr. Pearson about the speed of the engine as indicated by the exhaust was immaterial and incompetent. It is a well-known fact that the speed of the motor has no relation to the speed of the car if the clutch is out, and this was afterwards fully explained in the testimony of the defendant. But the principal reason why the speed shown by the exhaust of the engine was immaterial was because the witness himself did not use it to determine the speed of the car; in fact, he made it clear that the speed of the engine did not indicate the speed of the car, inasmuch as he testified that the car was going about 20 miles an hour, while the exhaust of the engine would indicate a speed of 30 miles an hour. But this testimony as to the speed indicated by the exhaust was undoubtedly made harmless by the witness' own explanation.

But the testimony of the witness as to what he believed to be the actual speed of the car presents a question of greater difficulty. There is no doubt about Mr. Pearson's competency to judge speed, but his opportunity to exercise such judgment in this case was very limited. He saw the automobile move through a space of only about 20 feet, "after it shot from behind the tank," to use his own words, and before the collision with plaintiff. He had no intimation that the automobile was approaching until it came into view from behind the tank, and the night was dark. In *Wright* v. *Crane,* 142 Mich. 508 (106 N. W. 71), the testimony of a witness was held incompetent who attempted to judge of the speed of an automobile from what he saw of it when passing over a space of 20 feet. But in that case the automobile was coming directly towards the witness, and the witness himself was not shown to have had any extraordinary knowledge of the speed of moving objects. In the instant case the witness was a railroad engineer of long experience. The court must take notice of the fact that it was part of his business to estimate speed by observation of objects which he was passing while in his engine, both by day and night. He must furthermore be given credit for some knowledge of his own ability in this respect, and he professed to be able to give an opinion in this case. We think the court was not in error in receiving his opinion as to the speed of the car. Such testimony should not be rejected unless it is clearly apparent that it can be of no value to the jury. Its weight is, of course, to be determined entirely by them. *Detroit, etc., R. Co.* v. *Van Steinburg,* 17 Mich. 99; *Guggenheim* v. *Railway Co.,* 66 Mich. 150 (33 N. W. 161); *Line* v. *Railway Co.,* 143 Mich. 163 (106 N. W. 719).

The witness Hazen Wilder was permitted to testify, on rebuttal, that he saw no lights on defendant's auto-

mobile. This testimony more properly belonged to plaintiff's main case, but the propriety of receiving it on rebuttal was discretionary with the court. *Kozlowski* v. *Railway*, 174 Mich. 412 (140 N. W. 459).

2. Error is assigned upon a ruling of the trial court excluding an ordinance of the city of Muskegon offered in evidence by counsel for the defendant. The particular provision of the ordinance which counsel wished to place before the jury reads as follows:

"Vehicles moving slowly shall keep as close as possible to the curb on the right, allowing more swiftly moving vehicles free passage to their left."

The ordinance was offered for the purpose of showing that the plaintiff, who was close to the street car tracks, and nearer to the center of the street than to the curb, was guilty of contributory negligence. The court excluded the ordinance as immaterial.

There are but two theories advanced as to the way in which the accident happened. If plaintiff's theory is true, the defendant, driving his automobile unlighted and at a high rate of speed, overtook the plaintiff and ran him down. If such was the case, the defendant was guilty of the most reckless conduct. Whether the plaintiff was guilty of contributory negligence or not in being near the center of the street, and in front of the car, such negligence could not have been a proximate cause of the accident. He was where the defendant, exercising any reasonable degree of care, should have seen him. The darkness of the night would have been no excuse whatever. If the plaintiff had come suddenly in front of the car, it would have been another thing, but that is not claimed by any one. According to his theory, he was riding along in the direction the car was taking and directly in its path. And the driver of an automobile cannot excuse himself for running down a man under such circumstances. He is required by law to have such lights as

will show objects immediately in front of him, and he must have his machine under such control as not to overtake and run down people within the scope of his lights.

"The contributory negligence of the plaintiff does not prevent recovery in a case where the defendant, who knows, or ought by the exercise of the most ordinary care to know, of the *precedent* negligence of the plaintiff, by his *subsequent* negligence does plaintiff an injury." *Richter* v. *Harper*, 95 Mich. 221, 225 (54 N. W. 768, 769).

The only other theory of the accident is that given by the defendant, who says that he did have lights upon his car sufficient to show him the ground in front of it for the distance of half a block; and he insists that the plaintiff was not riding in front of his car, but at one side, and turned as defendant came by and ran into defendant's car. If this version of the affair is true, then the defendant is not liable in this action. Plaintiff admits that he heard the automobile coming, and, if he turned and ran into it, he offered no excuse on the trial for doing so.

Hence in either case the ordinance was immaterial, and the court committed no error in excluding it. If defendant recklessly ran plaintiff down, as charged by plaintiff, contributory negligence was no defense. If plaintiff himself ran into defendant's car, he has advanced no theory by which he should be entitled to recover.

3. At the close of the trial, when the judge had finished his charge to the jury, he asked counsel:

"Is there anything I have overlooked?"

In reply counsel for the defendant said:

"If the court please, there is one claim of the defendant that I don't think you have specifically covered in your charge to the jury and upon which I ask your honor to charge them. It is claimed here by the

defendant that at the place where the accident happened was a street car curve, and that Mr. Harnau, either in getting out between the two street car tracks or in attempting to keep outside of the street car tracks where the turn is made, turned his bicycle towards the south, and therefore was not going in a line along the street, and that in so doing, as the automobile of the defendant was along the side of him, the plaintiff, Mr. Harnau, collided with the automobile by the bicycle being caught under the fenders of the car. I ask the court to charge the jury that, if it happened in that way, the defendant would not be liable for the accident; and, *secondly*, that they would have a right to consider that claim in considering this whole controversy."

In reply to this suggestion of counsel, the court said:

"I have charged you, gentlemen, all I am going to charge you. I charged you fully on the law of this case, gentlemen. You will take the case as I have given it to you."

Upon looking into the charge of the court, which is otherwise very full and complete, we cannot find that this theory of the defendant as to the cause of the accident was mentioned at all. As we have said, there were but two theories of the way in which it happened, the plaintiff's, and this of the defendant. The court had very fully stated the plaintiff's theory, and we think that, upon having his attention called to it, he should have explained to the jury the defendant's claim also. If, instead of being run down, the plaintiff himself ran into defendant's car, the latter would not be liable. In such event it was not claimed by any evidence at the trial that the accident resulted from the negligence of the defendant. It is true that the defendant's request was not in writing, but the court had asked counsel to mention anything omitted from his charge, and under the circumstances time should have been given counsel to present a written request

if that was desired. And the language in which the request was refused could not have been otherwise than detrimental to the defendant.

For this error, the judgment is reversed, and a new trial granted.

BROOKE, C. J., and KUHN, STONE, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.