## LUTTENTON v. DETROIT, JACKSON & CHICAGO RAILWAY CO.

1. STREET RAILWAYS—NEGLIGENCE—EVIDENCE—SUFFICIENCY.

   In an action against an interurban electric railway company for damages to plaintiff's automobile, caused by a collision with defendant's car, on a public highway, evidence that after the engine of the automobile stalled, near a crossing, plaintiff's brother ran down the track about 54 feet and waved his hat to attract the attention of the motorman, who gave no heed to the warning, but came on at a speed of from 20 to 25 miles an hour in violation of a city ordinance, and crashed into the automobile, and that if the motorman had been on the lookout he could have seen the automobile in time to avoid the accident, *held*, sufficient to present the question of defendant's negligence to the jury.

2. SAME—CONTRIBUTORY NEGLIGENCE—QUESTION FOR JURY.

   Where plaintiff's automobile became stalled on a public street a short distance from defendant's track, but whether in a place of safety or not is in dispute, and the driver, while his brother was attempting to crank the machine, loosened the brake, when it drifted back against defend-

ant's track and was struck by defendant's car, it cannot
be said that plaintiff was guilty of contributory negligence,
as a matter of law, there being no claim that the driver
intentionally placed the automobile in a position of danger.

3. SAME—NEGLIGENCE—DUTY OF MOTORMAN—OPERATION OF CAR—
RULE.

It was the duty of the motorman, under such circumstances,
to have the car under such control as to admit of its
being stopped after he became able to discover objects
on the track and before a collision with such object
should occur.

4. EVIDENCE—SPEED OF MOVING OBJECT NOT SUBJECT OF EXPERT
TESTIMONY—WEIGHT FOR JURY.

A witness need not be an expert to testify as to the rate of
speed of a moving object, since it is a matter of obser-
vation rather than expert knowledge, and the weight of
such testimony is for the jury after the witness has been
fully interrogated as to the basis for forming his judgment.

5. DAMAGES—ELEMENTS OF DAMAGES—TRANSPORTATION OF DAM-
AGED CAR.

In the absence of evidence that a damaged automobile
brought a better price in Detroit, where it was sold, than
it would at the place where it was· damaged, the cost of
storage and transportation to Detroit was improperly al-
lowed as an element of damages, in an action against the
wrongdoer.

6. SAME—DUTY OF PLAINTIFF TO MINIMIZE DAMAGES.

It was the duty of plaintiff to care for the automobile and
to secure to himself such value as it possessed, either by
having it repaired or by obtaining a reasonable price
therefor in its damaged condition.

7. STREET RAILWAYS—NEGLIGENCE—EVIDENCE—OPINION EVIDENCE.

A question asked of defendant's motorman as to whether
the crossing where the accident occurred was more than
ordinarily dangerous was not objectionable as calling for
the opinion of the witness, in view of a curve in the
track, the obscurity of his view, the decline in the road-·
bed after leaving the approach to the bridge, and the prob-
ability of persons or objects being on the track beyond
his vision, since his answer involved a knowledge acquired

by experience, which was special and not such as might have been acquired by any intelligent observer.

8. SAME—TRIAL—REQUESTED INSTRUCTION.

In view of the duty of the motorman to have his car under control, it was not error for the trial court to refuse a requested instruction that the standing of the automobile in such close proximity to defendant's tracks that it might be struck by a passing car was an unusual condition and one the motorman was not called upon to anticipate or be on the lookout for, to the exclusion of his other duties at that point, and that if the motorman did not discover the automobile as early as he might have done had he been aware of its presence, or on the lookout for it, this would not justify a verdict against the defendant.

MOORE, C. J., and STEERE and BROOKE, JJ., dissenting.

Error to Jackson; Parkinson (James A.), J. Submitted October 30, 1919. (Docket No. 9.) Decided February 27, 1920.

Case by Harry M. Luttenton against the Detroit, Jackson & Chicago Railway Company for negligently colliding with plaintiff's automobile. Judgment for plaintiff. Defendant brings error. Affirmed.

*W. S. Cobb,* for appellant.

*Price & Whiting,* for appellee.

SHARPE, J.    The plaintiff's automobile, a three-passenger Abbott-Detroit, while being driven by his brother Frank from Detroit to Jackson, was struck by one of defendant's interurban cars on Congress street, in the city of Ypsilanti, about 2 o'clock in the afternoon of May 9, 1915. There were three persons in the automobile, Frank, the driver, his brother, Charles R., and one Charles M. Holland. Near the place of the collision, defendant's railway crosses the Michigan Central railroad tracks on an overhead

bridge of truss construction. This bridge, in order to give the necessary clearance, is considerably higher than the general level of Congress street. In order to reach it, defendant's track goes upon a curve and rises to a considerable grade. The bridge itself is 130 feet long, and has a level approach of 28 feet at each end; the bridge and approaches making a level stretch of track about 186 feet in length. Immediately east of the east end of the bridge, Congress street is intersected by Miles street, which is also elevated in order to cross the Michigan Central tracks. Defendant's car was on its way from Jackson to Detroit.

The three persons in the automobile testified, in substance, that, before reaching Miles street, an automobile which they were following stopped, necessitating the stopping of their car; that when it started, a motorcycle came around the highway bridge over Miles street, necessitating another stop. When this stop was made, the motor stalled. The self-starter failed to work, and Charles got out to crank the car. It stood on a grade, and as the driver released the brake it "drifted back" a few feet and against the south rail of the defendant's track. While Charles was cranking the machine, they heard the noise of an approaching car on defendant's track, coming from the west. Charles then ran ahead between defendant's tracks to near the east end of the bridge, a distance of about 54 feet, and waved his hat to attract the attention of the motorman to the danger in which the machine was placed. That the motorman either did not see him or gave no heed to the warning, but came on at a speed of from 20 to 25 miles an hour and crashed into the motor car, carrying it a distance of 81 feet and damaging it badly.

The driver testified:

"I was far enough away from the track so I wouldn't have been hit if I had stayed right there."

At another time, in answer to a question he said:

"Q. You were not anywhere near the rails when you commenced to back?

"A. Yes, sir.

"Q. How near were you to them?

"A. Right near them."

His brother Charles testified:

"Q. How far were you from the track when you stopped the second time?

"A. We were very close to it. I wouldn't hardly consider it in feet; possibly 8 or 10 inches.

"Q. How far did your car drift back when your brother was using the self-starter?

"A. I couldn't answer that accurately. I don't know. I should say it drifted back 3 feet while he was using the starter.

"Q. Then you were so close to the track when you stopped the second time that a car coming along there would have struck you?

"A. Yes, sir."

The motorman denied that any such warning was given, and insisted that he was driving the interurban car with due care. He testified that as he approached the bridge from the west he applied the air so as to be prepared to stop at Miles street should any person be there intending to board the car; that when he got—

"possibly a quarter of the way upon the bridge, having seen nobody there who made any endeavor or any attempt to stop the car or there being nobody in sight there whatever, I let the air off, which allowed the car to travel on its own momentum. When I reached about the center of the bridge I saw an automobile standing down beyond the bridge a short distance and I at once grabbed the whistle cord and started to blow the whistle and with the other hand I reversed the car. But the force of the car and the weight of the car and the grade was such I struck the automobile. I wasn't reversed at the time and the interval wasn't enough to stop the car. * * * The car would per-

haps go 20 feet before the reverse would take effect at the speed I was going. * * * The car ran a little over its length after striking the automobile. The cars are forty-five to fifty feet in length."

On cross-examination, he testified:

"*Q.* You could have seen that car sooner if you had been looking right at the track?

"*A.* At that particular spot on that side of the track; yes, sir.

"*Q.* Wasn't it your duty—your business—to keep a sharp lookout for the track ahead of you, coming on a place like that?

"*A.* It wasn't ahead of me at that time; not directly ahead of me. It was a curve there.

"*Q.* Wasn't everything ahead of you which was on the track you are going to travel over?

"*A.* No, sir; not exactly. * *. *

"*Q.* You could see when you are in the center of the bridge and before you got to the center of the bridge, that automobile if you had been looking?

"*A.* If I had been looking at that particular point. * * *

"*Q.* You were paying no attention to the traffic. You were simply looking for passengers?

"*A.* At the time we are upon the bridge, yes.

"*Q.* Paying no attention whatever to the traffic?

"*A.* I wouldn't say that; no, sir.

"*Q.* If you had been you would have seen that automobile sooner than you did?

"*A.* If I had been paying attention to the traffic at that particular point, I would.

"*Q.* Wasn't it your duty to pay attention to the traffic in a place like that?

"*A.* To all traffic; yes, sir. * * *

"*Q.* Don't you consider this more than an ordinarily dangerous place?

"The foregoing question was objected to as immaterial.

"Objection overruled.

"*Mr. Cobb:* What do you mean by 'ordinary'?

"*The Court:* If the witness doesn't understand, the witness may say so.

"(Question read.)

"*A.* In other words, he asks me if this place is more dangerous than any other place?

"*The Court:* Answer it according to your understanding.

"*A.* Yes, sir; it is.

"*Q.* For that reason it requires greater care on the part of the motorman in approaching near it?

"*A.* Yes, sir."

He further testified that when he applied the reverse the car was traveling at the rate of from 8 to 10 miles per hour.

Stanley Rose, a motorman in the employ of the defendant, was riding in the car. He testified that his attention was first attracted by the blowing of the whistle and that the car was then near the east end of the bridge.

An ordinance of the city of Ypsilanti which limited the speed of defendant's cars within the city limits to 10 miles per hour was introduced in evidence.

The plaintiff had verdict and judgment for $811.41, and the defendant appealed.

While there are many assignments of error, we consider them as grouped by counsel for defendant in his brief.

1. Negligence of defendant. The negligence relied on by plaintiff was submitted by the trial court to the jury as follows:

"Plaintiff claims that defendant did not keep a proper lookout for persons who might be on the track in this place of danger; that one of the Luttentons did run up the track and signal the car and was not seen by the motorman, although he might have been seen, and that his warning to the motorman was not heeded. And plaintiff also claims that the motorman failed to so keep the car—the interurban car—under control as to avoid this accident when he discovered or might and should have discovered, by exercising proper care, that the automobile was in a place of danger; that he failed to obey the ordinances of the

city of Ypsilanti regulating the speed of interurban cars, by exceeding ten miles an hour, whereby the accident was caused; that the defendant's motorman also failed to operate the interurban car with reference to the particular locality and its surroundings and the peculiar or particular dangers to which persons in that vicinity having automobiles were liable or exposed."

There was testimony supporting plaintiff's claim in the several particulars stated. The duty of the motorman under the circumstances here presented has been so recently stated by this court that we content ourselves with the following quotation relative thereto:

"It was the duty of the motorneer to have the car under such control as to admit of its being stopped after he became able to discover objects on the track and before a collision with such object should occur." *Ablard* v. *Railway*, 139 Mich. 248.

—quoted approvingly in *Fischer* v. *Railway Co.*, 203 Mich. 671.

2. Negligence of plaintiff. In view of the apparently contradictory testimony as to the position of the automobile at the time it became stalled, we do not think it can be said as matter of law that it was in a place of safety when the brake was released and it "drifted back" near to the rail of defendant's track. There is no claim that the driver intentionally placed the machine in a position of danger. He had had considerable experience in driving. When he released the brake, it is apparent that his front wheels were in such a position that as it backed up a few feet the machine moved nearer to the track. This was mismanagement on his part. But, as there was then no car on defendant's track in sight, we do not think such act can be said, as a matter of law, to constitute such contributory negligence as will bar a recovery. As was said in the *Fischer Case*, at page 670:

"Fischer had little reason to expect that a motorman would approach a place of this character driving his car at a rate of speed which would preclude him from stopping it within a limited space if it became necessary."

The opinion in this case concludes as follows:

"As long as interurban companies are content to locate their lines upon public highways, they must yield to reasonable regulations for the protection of others who have a right to use them."

3. Admission of evidence. Complaint is made that Frank Luttenton was permitted to testify to the speed at which the car was running without any showing of such knowledge or experience as would enable him to form a judgment thereon. This witness was the driver of the automobile and had driven the same for a number of months. He had several times ridden on interurban cars and had formed a judgment of the speed at which they were running. While on cross-examination he said that it was a "mere guess" on his part, that answer must be considered in connection with his other answers tending to qualify him to testify in the matter. While the judgment of observers as to the speed of passing objects may greatly differ, we do not think it should be said as a matter of law that only experts who have timed them as they pass by can express an opinion as to the rate of speed at which they are moving. It is not a matter of expert knowledge, but of observation by one possessing some mental standard as to time and distance. The weight that should be given to such testimony is for the jury to determine after the witness has been fully interrogated as to that upon which his judgment is based and his opportunity for forming one. *Detroit, etc., R. Co.* v. *Van Steinburg,* 17 Mich. 99; *Guggenheim* v. *Railway Co.,* 66 Mich. 150; *Thomas* v. *Railway Co.,* 86 Mich. 496; *Mertz* v. *Railway,* 125 Mich. 11;

*Line* v. *Railway Co.,* 143 Mich. 163; *Garran* v. *Railroad Co.,* 144 Mich. 26; *Harnau* v. *Haight,* 189 Mich. 600. We find no error in the admission of this testimony.

Error is also claimed in the court having permitted the plaintiff to prove as an element of damage the expenses incurred in storing the automobile and afterwards transporting it to the factory in Detroit where it was manufactured and where it was afterwards sold, amounting to $40.50. It was the duty of the plaintiff to care for the car and to secure to himself such value as it possessed either by having it repaired or by obtaining a reasonable price therefor in its damaged condition. It is but reasonable to suppose that it could be more cheaply repaired at the factory in Detroit than in Ypsilanti. Had it been so repaired, we would consider these items allowable as damages. But it was not so repaired. There is no evidence tending to show that it brought a better price in Detroit than it would have sold for in Ypsilanti. We, therefore, conclude that these items should not have been submitted to the jury. There is, of course, a strong presumption that they were awarded as a part of plaintiff's damages.

The defendant's motorman was permitted to testify on cross-examination, over defendant's objection, that the crossing near which the collision occurred was "more dangerous than any other place." Defendant's counsel says:

"This testimony was not only improper, as calling for the opinion of the witness on a matter not properly the subject of opinion testimony, but for the further reason that whether or not the crossing was 'more than ordinarily dangerous,' was wholly immaterial to the issue."

The cases cited by counsel in support of this claim are those in which witnesses were asked to express

opinions as to whether a highway or street was in fact dangerous by reason of its lack of repair. No such question was here involved. No claim was made that either the street or defendant's roadbed was not in suitable condition for use. The question, in effect, was an inquiry of the witness as to whether, in view of the curve in the track, the obscurity of his view, the decline in the roadbed after leaving the approach to the bridge and the probability of persons or objects being on the track beyond his vision, it was necessary for him, in order to have his car under control, to observe greater care than usual when passing over the place in question. His answer involved a knowledge acquired by experience in handling his car and knowing how quickly and certainly it would respond to the means at hand for lessening its speed. This knowledge was special and not such as might have been acquired by any intelligent observer.

"The true test of the admissibility of such testimony is not whether the subject-matter is common or uncommon, or whether many persons or few have knowledge of the matter; but it is whether the witnesses offered as experts have any peculiar knowledge or experience, not common to the world, which renders their opinions founded on such knowledge or experience any aid to the court or the jury in determining the questions at issue." *Taylor* v. *Town of Monroe,* 43 Conn. 36, 44.

We do not find any Michigan decision in conflict with this rule, and believe it to be supported by the great weight of authority. 17 Cyc. (Opinion Evidence), p. 25 *et seq.*

4. Requests to charge. The court refused to give the defendant's seventh request to charge, which reads as follows:

"*Seventh.* The standing of the automobile against or in such close proximity to defendant's tracks, and outside of Miles street, that it might be struck by a passing car, was an unusual condition and one the

motorman was not called upon to anticipate or be on the lookout for, to the exclusion of his other duties at that point, such as looking for passengers who might want to board his car, and persons and vehicles approaching and crossing the track on Miles street. I, therefore, instruct you that should you find that the motorman did not discover the automobile as early as he might have done had he been aware of its presence or on the lookout for it, this would not justify a verdict against the defendant."

In view of what has been said on the question of the negligence of the defendant as to the duty of the motorman to have his car under control, we find no error in such refusal. Whether he exercised reasonable care in approaching the place where the collision occurred presented a question which the trial judge properly submitted to the jury.

After a careful examination of the entire record, we find no reversible error therein except as above stated. If the plaintiff will remit the sum of $40.50 from the judgment rendered within 30 days from the filing of this opinion, the judgment will stand affirmed, with costs to plaintiff. Otherwise, it will be reversed, with costs to defendant, and a new trial ordered.

FELLOWS, STONE, and BIRD, JJ., concurred with SHARPE, J.

Justice KUHN took no part in this decision.

BROOKE, J. (*dissenting*). The plaintiff recovered judgment against the defendant in the sum of $811.41 for damages to his automobile under the claim that the collision occasioning the loss was brought about through the negligent act of the defendant's agents. The accident happened about 2 o'clock in the afternoon on Congress street near the easterly limits of the city of Ypsilanti. Near the point of the accident defendant's railway crosses the Michigan Central rail-

way on an overhead bridge of truss construction. This bridge in order to give the necessary clearance to Michigan Central trains is much higher than the general level of Congress street. In order to reach it the railroad track goes upon a curve and rises at a considerable grade. The bridge itself is 130 feet long with a level approach at each end of 28 feet; the bridge and approaches together constituting a level piece of track about 186 feet long. Immediately east of the east end of the bridge Congress street is intersected by Miles street. On the day of the accident, plaintiff was not operating his car. It was in charge of his brother, Frank Luttenton, who was accompanied by another brother, Charles R. Luttenton, and one Charles M. Holland. They were driving from Detroit to Jackson in a westerly direction. Defendant's interurban car was being operated from Ypsilanti to Detroit in an easterly direction. Frank Luttenton, the driver of the machine, testified to the accident as follows:

"I came into Ypsilanti over Congress street. I was driving down this street and another automobile, a little ways in front of me, stopped just before reaching the Congress street bridge to let another automobile out around this bridge. I stopped directly behind him. There is hardly room for two machines to go around in there, and as he started up, a motorcycle came around this bridge. He stopped again and I also. In stopping the car the motor stalled. I tried to start the machine and the self-starter wouldn't work and when I released the brake it drifted back against the side of the street car track, at the north side of Congress street.

"The rail was the height of the rail above the level of the street. The car was right against the rails on the track. There is quite a grade there. When coming west you are coming up grade.

"My brother got out to crank the car and as he was cranking it, he heard a street car approaching from the west. He ran ahead, to near the head of the

bridge, the head of Miles street, to flag the car and stop it. He went about 54 feet. I think we paced it off at the time.  *  *  *

"Miles street runs in a northerly and southerly direction and the distance from the west side of Miles street to the point where the automobile was is 72 feet. When my brother ran up the track to signal the street car, when he got up there, he stepped upon the middle of the street car track and gestured with his hands. The street car came right through and never stopped. It hit us and carried us down the track 81 feet.

"*Q.* You observed that car as it came along down there?

"*A.* Yes, sir."

And on cross-examination:

"*Q.* You claim you can see that car 70 feet west of the bridge, do you, from where you were?

"*A.* See the top of the car; yes, sir. I have seen cars coming over there; seen the tops of them. Sitting in the automobile you could see a car as it approached there about 70 feet west of the bridge. *  *  * I knew cars ran at frequent intervals over that track and that I might expect one along there at any time. I could see a car to the east for a long ways when approaching.

"*Q.* How much of a grade is there east of that bridge, commencing at the bridge, toward the east?

"*A.* (Referring to map.) There is quite a grade there. I couldn't tell exactly what grade. It extends a considerable distance east of where our car was.

"*Q.* Which wheel of your car rested against the rail?

"*A.* Both wheels on the right-hand side of the car.

"*Q.* You remember that distinctly, do you?

"*A.* Yes, sir.

"*Q.* Your starting apparatus was then out of commission?

"*A.* Yes, sir.  *  *  *

"*Q.* You stopped your car, you say, going up this grade, just as you were about to turn on to Miles street, did you?

"*A.* Yes, sir. I was right at the edge of Miles street when I stopped my car.

"*Q.* How wide is Miles street there?

"*A.* 29 feet. I did not have to guess where my car was when I went back there with Mr. Riley. I had measured it from the bridge right off, the day of the accident, with a yard stick. There was an automobile driving ahead of us that day and had been for a mile or more. It passed us.

"*Q.* What became of it?

"*A.* It went on over the bridge. When they stopped I didn't see him start the car but I seen the car go on. That car did not drift back down the hill at all.

"*Q.* You could hold your car there with the brake if you wanted to, couldn't you?

"*A.* I couldn't and start it.

" (Question read.)

"*A.* Yes, sir.

"*Q.* Why didn't you?

"*A.* I wanted to get started and get away from there.

"*Q.* How was it going to help you to get started to drift against the street car track?

"*A.* It wasn't going to help us to start it, drifting against the street car track.

"*Q.* You could have avoided drifting against the street car track if you wanted to, couldn't you? You know you could, don't you?

"*A.* I could have avoided—

"*Q.* You could have avoided your car going near the street car track if you wanted to? Why do you hesitate about that?

"*A.* I don't just exactly understand it.

"*Q.* You could have avoided your car running over against the street car track if you wanted to?

"*A.* Yes, sir.

"*Q.* Why didn't you?

"*A.* Because the man in front of me with the automobile turned—

"*Q.* (Interrupting.)  No.  When your car commenced to back you needn't have backed against the street car track? You could have backed the other way if you wanted to?

"*A.* No, sir; it was up grade.

"*Q.* Why not?  You can back that·automobile any way you want to.

"*A.* Got against the rails.

"*Q.* You needn't have got against the rails.  You were not anywhere near the rails when you commenced to back.

"*A.* Yes, sir.

"*Q.* How near were you to them?

"*A.* Right near them.

"*Q.* How wide is Miles street—the street car track there on Miles street and Congress street?

"*A.* It measures 18 feet from the telephone pole on the corner by the bridge over to the street car track.

"*Q.* How wide is Congress street right at that point?

"*A.* I just told you.

"*Q.* 18 feet.  So instead of Miles street, where it is 18 feet, you were outside of Miles street, weren't you?

"*A.* It was 18 feet to get up there.  I don't know just how wide it was.

"*Q.* When you get outside of Miles street east, it is a good deal more than 18 feet across there, isn't it, down there where your automobile was and in near there?

"*A.* Yes, sir.  I didn't measure it across there.  I know there wasn't room for two automobiles to go on here and let another one pass.

"*Q.* Right at the edge of Miles street, 18 feet from the street car track to the south line of Congress street; is that what you mean?

"*A.* There was a pole setting in there; a telephone pole set right in there (indicating).  I mean it was 18 feet to that telephone pole from the south line of the street car track.

"*Q.* You were back down here at that time (indicating); you hadn't got to Miles street yet, you say. It would be down there, isn't that true?

"*A.* Measure it.  That was where we were at this time before the car went by.

"*Q.* You don't want to be understood as saying that the south line of Congress street was only 18 feet from the south line of the rail at the point where you stopped your car, do you?

"*A.* No, sir.

"Q. Why couldn't you have backed your car away from the track instead of toward the track?

"A. Because I was facing away from the track.

"Q. Your steering gear worked all right, didn't it?

"A. Yes, sir.

"Q. You needn't have let it back up toward the track? You could have swung your car around and backed it the other way?

"A. I believe I possibly could. I could if there was room there to do it. The track projecting up from the rail prevented me from backing my car around.

*    *    *

"Q. Now, when you tried to start your machine when you had stopped on the hill there, you were entirely out of danger, weren't you, when you first stopped?

"A. No, sir. I was right near the track. I was far enough away from the track so I wouldn't have been hit if I had stayed right there. I was trying to use my starter and it didn't work. My brother got out to crank the car before I drifted back against the track. He tried to crank it before we drifted against the track. The battery seemed to be dead and it wouldn't work. Then my brother got out to crank her. I held the car with the brake while he was cranking. He cranked it several times.

"Q. What did he do then?

"A. I released the brake and the car came down on level ground.

"Q. Then you released the brake and let it slide back against the interurban track, did you not?

"A. Yes, sir. The man who was with me in the car and I sat right in the car; didn't get out at all. My brother was out before that; I wasn't at all excited.

"Q. You knew that you were backing against the interurban tracks, or didn't you look to see where you were going?

"A. I knew that I was backing near the tracks.

"Q. How many minutes, did you say, from the time you stopped to let the automobile go ahead, before you were injured?

"A. I couldn't say exactly. It was a very short time. I tried once, anyway, to start it with the starter. Might have tried more. Then my brother got out and cranked it a number of times.

"*Q.* Then you released your brake and let it drift down against the interurban track, did you?

"*A.* Yes, sir.

"*Q.* All that must have taken four or five minutes, didn't it?

"*A.* Might have taken that much time.

"*Q.* You knew all the time that the interurban track was there, didn't you?

"*A.* Yes, sir. I knew a car might be expected over it at any time."

It was the claim of plaintiff that the collision occurred through no fault or negligence of his agent, but solely through the negligence of the defendant's agents in operating a street car at so high a rate of speed (contrary to the ordinance of the city of Ypsilanti), that it was impossible to stop it, after plaintiff's position was or should have been discovered in time to have avoided the accident.

It was defendant's claim that the street car was being operated while upon the bridge at a rate of speed fully under control and such that it could have been stopped to take on passengers at Miles street; that no passengers appearing at that point the air was released and the car's speed was accelerated so that after the discovery of the situation of the automobile a collision could not be avoided even though the brakes were immediately applied. At the close of plaintiff's case a motion was made on behalf of the defendant for a directed verdict upon the ground that plaintiff through his agent was guilty of such contributory negligence as should prohibit recovery. This motion was denied and the case submitted to the jury under a charge permitting the jury to pass upon both plaintiff's contributory negligence and defendant's negligence with the result before pointed out.

We have quoted all the testimony directly bearing upon the question of plaintiff's negligence and have reached the conclusion that defendant's motion for a

directed verdict under the testimony as it stood should have been granted, even assuming that defendant was operating its car at a rate of speed in excess of the ordinance regulations. Plaintiff's agent was driving the automobile in close proximity to the interurban track up a rather steep grade. Apparently through no fault of his own it became stalled, but at a point where it was entirely safe. His agent says:

"I was far enough away from the track so that I would not have been hit had I stayed right there."

He knew that the interurban track was in close proximity, that a car might be expected at any moment; that he was safe where his car then stood, and yet in the face of this knowledge he released his brake and so cramped his car that in drifting backward the wheel rested against the track. He knew that the engine was dead, and though several attempts had been made to start it, it failed to respond. He testified that his steering gear was in good condition. Desiring to back the car up there appears no reason why he should not have backed it at a safe distance from the track, instead of allowing it to get into a position of danger from which he could not readily remove it.

The judgment should be reversed, with costs, and a new trial ordered.

MOORE, C. J., and STEERE, J., concurred with BROOKE, J.